1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name    MEJIA         JIMMY         G.

          (Last)        (First)      (Initial)

3  Prisoner Number    C-10575

4  Institutional Address    Correctional Training Facility

5                 P.O. Box 689, Soledad, CA 93960

*FILED*

*AUG 15 2008*

*RICHARD W. WIEKING*
*CLERK, U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF COURT*
*DISTRICT OF CALIFORNIA*

6

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  JIMMY G. MEJIA,

  (Enter the full name of plaintiff in this action.)

9              vs.

10  BEN CURRY (Warden),

11  XXXXXXXXXX

12  XXXXXXXXXX

13

14  (Enter the full name of respondent(s) or jailer in this action)

CV 08   3912

Case No. _____
(To be provided by the clerk of court)

**PETITION FOR A WRIT**
**OF HABEAS CORPUS**

JF

E-filing

15

16  <u>Read Comments Carefully Before Filling In</u>

17  <u>When and Where to File</u>

18        You should file in the Northern District if you were convicted and sentenced in one of these

19  counties:  Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located.  If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined.  Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS     - 1 -

Who to Name as Respondent

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

    (a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Los Angeles County Superior Court   Los Angeles

         Court                Location

    (b)   Case number, if known __A524887__

    (c)   Date and terms of sentence __11/14/1979, 15 years to life__

    (d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes __XX__   No ____

         Where?

         Name of Institution: __Correctional Training Facility__

         Address: __P.O. Box 689, Soledad, CA 93960__

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

__Second degree murder / P.C. § 187__

_____

_____

3. Did you have any of the following?

| | | |
|---|---|---|
| Arraignment: | Yes _____ | No _____ |
| Preliminary Hearing: | Yes _____ | No _____ |
| Motion to Suppress: | Yes _____ | No _____ |

4. How did you plead?

Guilty _____    Not Guilty _____    Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury _____    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?    Yes _____    No _____

7. Did you have an attorney at the following proceedings:

| | | | |
|---|---|---|---|
| (a) | Arraignment | Yes _____ | No _____ |
| (b) | Preliminary hearing | Yes _____ | No _____ |
| (c) | Time of plea | Yes _____ | No _____ |
| (d) | Trial | Yes _____ | No _____ |
| (e) | Sentencing | Yes _____ | No _____ |
| (f) | Appeal | Yes _____ | No _____ |
| (g) | Other post-conviction proceeding | Yes _____ | No _____ |

8. Did you appeal your conviction?    Yes _____    No _____

(a)    If you did, to what court(s) did you appeal?

Court of Appeal    Yes _____    No _____

Year: _____    Result: _____

Supreme Court of California    Yes _____    No _____

Year: _____    Result: _____

Any other court    Yes _____    No _____

Year: _____    Result: _____

(b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS         - 3 -

petition?                                              Yes _____   No_____

    (c)   Was there an opinion?                  Yes _____   No_____

    (d)   Did you seek permission to file a late appeal under Rule 31(a)?

                                               Yes _____   No_____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?                  Yes __XX__   No_____

    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

    (a)   If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

        I.    Name of Court: _Los Angeles County Superior Court_

            Type of Proceeding: ___Habeas corpus_____

            Grounds raised (Be brief but specific):

            a._SAME AS RAISED HEREIN_____

            b._____

            c._____

            d._____

            Result: _Denied_          Date of Result: _10/2/2007_

        II.   Name of Court: _Calif. Court of App. 2nd App. Dist._

            Type of Proceeding: ___Habeas corpus_____

            Grounds raised (Be brief but specific):

a. __SAME AS RAISED HEREIN__

b. _____

c. _____

d. _____

Result: __Denied_____ Date of Result: 11/21/2007

III.    Name of Court: ____California Supreme Court____

Type of Proceeding: ____Habeas corpus____

Grounds raised (Be brief but specific):

a. __SAME AS RAISED HEREIN__

b. _____

c. _____

d. _____

Result: __Denied_____ Date of Result: 6/18/2008

IV.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _X__    No_____

Name and location of court: _9th Cir., 06-56444_

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS          - 5 -

need more space.  Answer the same questions for each caim.

Claim I

PETITIONER'S RIGHT TO DUE PROCESS GUARANTEED BY THE FIFTH
AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION WAS VIOLATED WHEN THE STATE COURT DECISION
AFFIRMING THE BOARD OF PAROLE HEARINGS DECISION TO DENY
PETITIONER PAROLE WAS UNREASONABLE IN LIGHT OF THE FACTS

---

Supporting facts:

On November 14, 1979, Jimmy G. Mejia (hereafter Petitioner)
pled guilty, and sentenced, to one count of second degree murder
in violation of Penal Code § 187[1/] and the use of a firearm in
violation of Penal Code § 12022.5.  Pursuant to Penal Code § 190,
Petitioner was sentenced to an indeterminate term of 15 years to
life, plus a two year determinate term for the use of a firearm.

The 2006 parole suitability hearing takes up where Petitioner's
2005 decision of unsuitability for parole leaves off (EXHIBIT 1,
decision dated April 28, 2005).  Petitioner was deferred one year.
The primary concern of the 2005 Board was the "moderate" rating for
future violence on Petitioner's psychological evaluation (EX. 1,
p. 6).  The Board's emphasis was on a new psychological evaluation
for Petitioner's current risk to public safety, clearly stating that
was the only issue left, "specifically on the Assessment of
Dangerousness level" (EX. 1, pp. 6-9; EXHIBIT 2).

On October 25, 2006, Petitioner appeared before the Board of
Parole Hearings (hereafter Board) for a subsequent parole suitability
hearing (EXHIBIT 3).  Petitioner's minimum eligible parole date was

---

1.  All codes and regulations are California, unless otherwise noted.
    California Code of Regulations, Title 15, will be cited, Cal. Code Regs.,
    tit. 15.

- 6 -

affirmed to have been March 17, 1987 (EX. 3, HT 1:10-11).[2]

The facts of the commitment offense read into the record by the Board were not recorded due to an equipment malfunction (see HT 5), so the facts cited by the Los Angeles County Superior Court in its decision (EXHIBIT 4, p. 1) will be used:

> "The record reflects that on June 10, 1979, the Petitioner and a friend decided to rob a drug dealer at gunpoint. They armed themselves and went to the drug dealer's apartment. While they were heading toward the drug dealer's apartment, they encountered a man who inquired as to why they were there with guns. Fearing they had been caught, the Petitioner and his friend left the apartment building. At that point. the victim, Thomas Biddle, and another man chased after the Petitioner and his friend. The Petitioner claims that he stopped and told the victim, "we don't have to hurt each other", but the victim continued to confront him. The Petitioner saw the victim was armed and fired several shots victim's direction. The victim was able to run away, however, one of the shots hit the victim and he was killed."

The Board then questioned Petitioner about his prior criminal and social history (HT 6-14). Petitioner has an extensive prior criminal history starting as a juvenile, to include, as an adult, one conviction for involuntary manslaughter for the death of his common-law wife, and vehicular manslaughter when two people were killed in an auto accident while Petitioner was driving under the influence. Petitioner's criminal history is intertwined with his abuse of drugs, to include alcohol, the most abused drug of all.

Petitioner has received five (5) CDC-115 disciplinary reports, the last one dated March 1, 1986, for being under the influence of alcohol (HT 22:5-6). It was at that time Petitioner came to the realization that substance abuse was the root of his criminal behavior and made a conscious decision to change who he was and become a

---

2. References to parole hearing transcript, EXHIBIT 3, will be noted by HT followed by page number and line number, e.g., (HT 1:1).

productive citizen (HT 55:15-56:22), having attended AA since 1985 (HT 21:14-21), as well as a plethora of additional self-help and therapy programs (HT 21:8-14; 22:23-23:3).

Petitioner's recent psychological evaluation, dated September 8, 2006, prepared by Dr. W.K. Marek (EXHIBIT 5), was reviewed by the Board (HT 24:11-26:7). It was Dr. Marek's expert opinion that Petitioner's "prognosis for successful, responsible, legal, prosocial community adjustment is good" and his "insight and judgment were good" (EX. 5, p. 3; HT 24:19-25). Under assessment of current risk, it is Dr. Marek's expert opinion that "[i]f released to the community, [Petitioner's] violence potential is considered to be about the same as the average citizen" (EX. 5, p. 3; HT 26:1113). TAKE JUDICIAL NOTICE. It is noteworthy that Dr. Marek stated, in referring to actuarial measuring instruments for predicting "future violence" and the assessment of "moderate": "His last evaluator said these testing results would likely <u>never</u> change, due to the instruments' attention to past criminal factors. This is useful information but never allows the inmate to 'move beyond a score,' allowing him to demonstrate improved maturity, judgment and insight. This evaluator cannot predict future free will and behavior but Mejia is doing all he reasonably can to convince the Board that he is a changed individual" (EX. 5, p. 3; HT 25:17-25). <u>See also</u> EXHIBIT 6, declaration of Dr. Melvin Macomber pointing out the inherent flaw of using certain actuarial measuring instrument to predict future violence of a life prisoner, such as those used by Dr. Livingston in his October 2003 (EXHIBIT 7).

The Board then reviewed Dr. Livingston's 2003 psychological

- 8 -

evaluation (EXHIBIT 7; HT 26:8-28:2), focusing on Dr. Livingston "experienc[ing] some incredulity" regarding Petitioner's explanations of shooting his wife and the instant offense (EX. 7, p. 5; HT 27:13-21).

The Board then gave nothing more than an acknowledgment to the extensive, in depth psychological evaluation privately obtained by Petitioner from Dr. Mevin Macomber (EXHIBIT 3). Dr. Macomber, however, goes into detail explaining the fallacy of using certain actuarial measuring instruments (EX. 8, pp. 7-3). Assessing Petitioner's current risk, it was Dr. Macomber's expert opinion: "At this point in his life, there are more positive factors than there are negative factors. I agree with the previous evaluator, Dr. Marek, who stated that he does not pose any more risk to society than the average citizen in the community" (EX. 8, p. 14). Dr. Macomber then goes on to detail eight (8) specific factors in forming his expert opinion (EX. 8, pp. 10-12).

### D E C I S I O N   O F   T H E   B O A R D

It was determined that Petitioner was not suitable for parole and "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison" and deferred one year (HT 59:15-18). The factors supporting the decision were two-fold: (1) the commitment offense being "carried out in a dispassionate manner which demonstrates an exceptionally callous disregard for human suffering. The motive for the crime was inexplicable and was incredibly trivial relation to the offense" (HT 58:19-25); and (2) prior social history, to include prior substance abuse and criminality, to include the conviction of involuntary manslaughter

- 9 -

in the death of his wife and the vehicular manslaughter in the death
of two women (HT 59:8-24).

The decision to find Petitioner unsuitable for parole became
final on February 22, 2007 (HT 62).

### S T A T E   C O U R T   D E C I S I O N

On May 7, 2007, Petitioner sought relief in the Superior Court
of California, County of Los Angeles.  On October 2, 2007 the Los
Angeles County Superior Court denied Petitioner's writ (EXHIBIT 4).
In doing so, the state court opined that the Board's finding relative
to the commitment offense was not supported by the evidence, writing:
"The Court finds that there is no evidence to support the Board's
findings that the commitment offense was carried out in a
dispassionate and calculated manner, that the offense demonstrated
an exceptionally callous disregard for human suffering, or that the
motive was very trivial in relation to the offense" (EX. 4, p. 1).
Concluding, "While this was certainly a terrible crime, it was no
more aggravated or violent than most second-degree murders and thus,
did not demonstrate an exceptionally callous for the victim's
suffering" nor was it "very trivial in relation to the offense" (EX.
4, p. 2).

The state court, did, however, affirm the Board's decision based
on Petitioner's prior criminal history, which included "assault with
intent to commit murder, which resulted in the death of Petitioner's
common law wife; as well as manslaughter by vehicle, which resulted
in the deaths of two women" (EX. 4, p. 2).  Although there were other
findings by the state court, they were not, exclusively reliable
to deny parole, but collectively with the other factors, weighed

against parole suitability (EX. 4, pp. 2-3).

The state court was of the opinion that despite "flaws" in the Board's findings, Petitioner would have been found unsuitability based on his prior criminal/social history (EX. 4, p. 3).

On or about November 1, 2007, Petitioner filed a habeas corpus in the Appellate Court of California, Second Appellate District. The habeas petition was summarily denied on November 21, 2007.

On December 13, 2007, Petitioner mailed an original writ of habeas corpus to the California Supreme Court. For whatever reason, however, the writ did not get filed until January 14, 2008. The habeas corpus was summarily denied by the California Supreme Court on June 18, 2008 (EXHIBIT 9).

\* \* \* \* \* \* \*


If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

This claim has been exhausted.

1       List, by name and citation only, any cases that you think are close factually to yours so that they

2   are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3   of these cases:

4   _____PLEASE SEE MEMORANDUM OF LAW ATTACHED HERETO_____

5   _____

6   _____

7   Do you have an attorney for this petition?                    Yes_____     No__XX__

8   If you do, give the name and address of your attorney:

9   _____

10      WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on __8-5-2-008__                    _Jimmy G. Mejia_

14            Date                              Jimmy G. Mejia
                                       Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

## M E M O R A N D U M   O F   L A W

### I N T R O D U C T I O N

In November, 1979 Petitioner pled guilty to one count of second
degree murder with the expectation that he would be paroled when
he served his minimum term <u>and</u> demonstrated that he could live in
society without committing further antisocial acts against society.
The state was fully aware of Petitioner's prior conviction for
involuntary manslaughter and conviction for vehicular manslaughter.
The state court agrees that Petitioner's instant offense of second
degree murder is <u>not</u> beyond the minimum necessary to sustain the
conviction and therefore opined that it, in and of itself, was not
some evidence of unsuitability for parole, but rather, relied on
Petitioner's prior criminal/social history as "some evidence" to
support the Board's decision of unsuitability for parole.

The issue before the Court boils down to this: Regardless of
Petitioner's convicted and past convicted offenses, if he was
sentenced to an indeterminate term with an expectation of parole,
can he be denied parole on immutable factors of his past
criminal/social history when he has exceeded his minimum term <u>and</u>
is rehabilitated?

I

### JURISDICTION OF THE COURT

The Board's decision became final on February 22, 2007.  On
or about May 7, 2007 Petitioner filed his habeas corpus petition
in the Superior Court of California, Los Angeles County, being denied
October 2, 2007, then filing in the state appellate court on or about
November 1, 2007, being denied on November 21, 2007, then filing

in the California Supreme Court on or about December 13, 2007 and being denied on June 18, 2008. As of August 15, 2008, the approximate date of the filing of Petitioner's federal habeas corpus, approximately 185 days have been tolled, leaving Petitioner a reserve of approximately 180 days of the one year in which he has to exhaust state remedies (28 U.S.C. § 2244(d)(1)(A)).

## II

### PETITIONER HAS A LIBERTY INTEREST IN PAROLE

It is settled, California's indeterminately sentenced prisoners have a liberty interest in parole (Greenholtz v. Inmates of Nebraska Penal and Correctional Complex (hereafter Greenholtz), 442 U.S. 1 (1979); Sass v. California Board of Prison Terms, 461 F.3d 1123 (9th Cir. 2006); In re Rosenkrantz, 29 Cal.4th 616 (2002); In re Dannenberg, 34 Cal.4th 1061 (2005)).

A prisoner's writ may be granted where the state court actions "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (28 U.S.C. § 2254(d)). The Supreme Court is not required to have addressed the identical factual circumstances at issue in order for it to have created "clearly established" law governing a case. It is enough that the Supreme Court has prescribed a rule or governing principle that plainly governs the petitioner's claim at the time of the state court decision (Williams v. Taylor, 529 U.S. 362, 413 (2000); Carey v. Musladin, 549 U.S. ___, 127 S.Ct.

649, 656 (2006), plurality opinion ["...AEDPA does not require state
and federal courts to wait for some nearly identical factual pattern
before a legal rule must be applied"]), less the Supreme Court be
reduced to micromanaging state and federal courts.

### III

THE STATE COURT DECISION SUSTAINING THE DECISION TO
DENY PETITIONER PAROLE WAS UNREASONABLE IN LIGHT
OF THE FACTS.

The Board's decision to find Petitioner unsuitable for parole
must be supported by "some evidence" that he is a current risk to
pubic safety, but some evidence of what? By the time case at bench
is argued by the respondent, the primary question of some evidence
of what should be settled by the California Supreme Court in In re
Lawrence, decision due September 2, 2008. At this time, however,
Petitioner relies on In re Lee, 143 Cal.App.4th 1400, 1408 (2006)
["the relevant test is not whether some evidence supports the reasons
cited for denying parole, 'but whether some evidence indicates [an
inmate's] release unreasonably endangers public safety"]; In re
Rosenkrantz, 29 Cal.4th 616, 683, supra ["'The Board's authority
to make an exception [to the requirement of setting a parole date]
based on the gravity of a life term inmate's current or past offenses
should not operate so as to swallow the rule that parole is normally
to be granted...'"]; In re Tripp, 150 Cal.App.4th 306, 313 (2007)
["It violates a prisoner's right to due process when the Board or
Governor attaches significance to evidence that forewarns no danger
to the public or relies on unsupported conclusions"]; In re Scott
II, 133 Cal.App.4th 573, 594-595 (2005) ["...the predictive value
of the commitment offense may be very questionable after a long period

of time"]; In re Elkins, 144 Cal.App.4th 475, 496-498 (2006) ["denial
of parole must be viewed in light of 'subsequent circumstances,'
namely the rehabilitative efforts made by the inmate while in
prison"]). In other words, as articulated by the United States
Supreme Court: "It is important that we not overlook the ultimate
purpose of parole which is a component of the long-range objective
of rehabilitation" (Greenholtz, 442 U.S., at 13, supra). Thus, "[t]he
behavior record of an inmate during confinement is critical in the
sense that it reflects the degree to which the inmate is prepared
to adjust to parole release" (Id., at 15; see also In re Minnis,
7 Cal.3d 639, 644 (1972); In re Rodriquez, 14 Cal.3d 639, 652 (1975)).

     The Ninth Circuit warned: "in some cases, indefinite detention
based solely on an inmate's commitment offense, regardless of the
extent of his rehabilitation, will at some point violate due process,
given the liberty interest in parole that flows from relevant
California statutes" (Irons v. Carey, 505 F.3d 846, 854 (9th Cir.
2007)). While the Board's "reliance on the gravity of the offense
and conduct prior to imprisonment to justify denial of parole can
initially be justified as fulfilling the requirements of state law[,]
[¶] "[a] continued reliance in the future on an unchanging factor,
the circumstance of the offense and prior criminal history, runs
contrary to the rehabilitative goals espoused by the prison system
and could result in a due process violation" (Biggs v. Terhune, 334
F.3d 910, 916-917 (9th Cir. 2003)).

     The only factors the state court relied on to sustain the Board's
decision of Petitioner's unsuitability for parole was the immutable
factors of his prior criminal/social history, all of which is three

decades old.  It is true that Petitioner was convicted of involuntary

manslaughter and vehicular manslaughter, neither of which include

the elements of intent or malice.  In fact, involuntary manslaughter

is the result of doing a lawful act in an unlawful manner, or without

due caution or circumspection (Penal Code § 192).  Certainly, such

offenses to not rise to the "gravity" anticipated by the California

Legislature in Penal Code § 3041(b).  Even a prior murder conviction

does not preclude one from being eligible for and found suitable

for parole.  Moreover, in reviewing parole suitability, the Board

"must remain focused not on the circumstances that may be aggravating

in the abstract but, rather, on facts indicating that release

currently poses 'an unreasonable risk to society" (In re Elkins,

144 Cal.App.4th, at 499, supra, emphasis added).  Petitioner's

convictions for involuntary manslaughter and vehicular manslaughter,

certainly not cold blooded motiveless murders, have lost their

predictive value, especially in light of his rehabilitation.

    "[T]he viciousness of the commitment offense (or past offenses)

must be balanced against the passage of time and rehabilitation"

(In re Tripp, 150 Cal.App.4th, at 309, supra).  The state and federal

courts have, for the most part, reached a consensus that after

reaching the minimum sentence, in case at bench 15 years, the

commitment offense loses predictive value in determining a current

risk to public safety or reoffending (McCarns v. Dexter, 534 F.Supp.2d

1138, 1153 (C.D. Cal. 2008); Sanchez v. Kane, 444 F.Supp.2d 1049,

1062 (C.D. Cal. 2006); Rosenkrantz v. Marshall, 444 F.Supp.2d 1063,

1084 (C.D. Cal. 2006); Willis v. Kane, 458 F.Supp.2d 1126, 1135 (N.D.

Cal. 2007); In re Lee, 143 Cal.App.4th, at 1409, 1412, supra; In

re Scott II, 133 Cal.App.4th, at 595, supra; In re Elkins, 144
Cal.App.4th, at 498, supra; In re Roderick, 154 Cal.App.4th 242,
277 (2007) [offense loses predictive value after serving minimum
term]). Petitioner satisfied his minimum term of 15 years on or
about March 17, 1937, 21 years ago.

"The [Board's] assumption that a prisoner may be deemed
unsuitable for release on the basis of the commitment offense alone
is correct (citation, footnote ommitted), but that proposition must
be properly understood. The commitment offense is one of only two
factors indicative of unsuitability a prisoner cannot change (the
other being his 'Previous Record of Violence.'") (In re Scott II,
133 Cal.App.4th, at 594-595, supra). The Scott court opined:
"Reliance on such an immutable factor 'without regard to or
consideration of subsequent circumstances' may be unfair (citation),
and 'runs contrary to the rehabilitative goals espoused by the prison
system and could result in a due process violation.' (Biggs v.
Terhune, supra, 334 F.3d at 917)" (In re Scott II, 133 Cal.App.4th,
at 595, supra; see also In re Elkins, 144 Cal.App.4th, at 496, supra).
"Therefore, a life term offense or any other offenses underlying
an indeterminate sentence must be particularly egregious to justify
the denial of a parole date" (In re Rosenkrantz, 29 Cal.4th, at 633,
supra, citation omitted, emphasis added).

Petitioner has far exceeded his minimum term, and, most
importantly, he is rehabilitated. The Board, nor state court,
presents any contravening evidence to the forensic experts in case
at bench. If the Board were allowed to rely on Petitioner's prior
criminal/social history to deny him parole when he is rehabilitated,

- 18 -

then Petitioner could die in prison when he is not a <u>current</u> threat to pubic safety, violating his right to due process (<u>Foucha v. Louisiana</u>, 504 U.S. 71 (1992); <u>Kansas v. Hendricks</u>, 521 U.S. 346 (1997) [although a person is still dangerous, if the underlying mental illness is no longer present, dangerousness alone cannot justify detention.]  If a person who committed a crime as a result of mental illness cannot be incarcerated if his or her mental illness is no longer at issue but is still dangerous, then how can the state justify the continued imprisonment of a person who is not mentally ill and deemed no longer a danger to society by forensic experts?

Additionally, only disciplinary offenses that are serious enough to warrant the rescission of a parole date may be used to extend or deny parole suitability (<u>see</u> 1981 WL 126313, *3 fn. 4 (Cal.A.G.); 64 Ops Cal. Atty. Gen. 776).

### C O N C L U S I O N

Although Petitioner was a danger to society 30 years ago, the Board nor state court presented any evidence that Petitioner is a <u>current</u> risk to society, thereby violating his right to due process in finding him unsuitable for parole.

WHEREFORE, it is respectfully requested that this Court issue an Order to Show Cause why the writ should not be granted and a new hearing conducted within thirty (30) days in which the Board complies with due process of law, and, unless there is evidence that Petitioner is a <u>current</u> risk, he be found suitable for parole and a release date fixed.

DATED:  _8-5-2008_

Respectfully submitted,

_Jimmy G. Mejia_
Jimmy G. Mejia
Petitioner in pro se

- 19 -

# EXHIBIT 1

63

1      **CALIFORNIA BOARD OF PRISON TERMS**

2      **D E C I S I O N**

3      **DEPUTY COMMISSIONER RODRIGUEZ:**  We're back

4      on record.  All parties are present.

5      **PRESIDING COMMISSIONER ANGELE:**  This is in

6      the matter of Jimmy Mejia, CDC number C Charles

7      10575.  Mr. Mejia, the Panel has reviewed all

8      information received from the public and relied on

9      the following circumstances in concluding that

10     you're not yet suitable for parole and would pose

11     an unreasonable risk of danger to society and a

12     threat to public safety.  First, the offense,

13     carried out in a violent, brutal manner.  Multiple

14     victims were killed in separate incidents.  The

15     offense was carried out in a manner which

16     demonstrates an exceptionally callous disregard for

17     human suffering and human life and human safety.

18     The murder of the victims did not deter the

19     prisoner from later committing other criminal

20     offenses.  (Indiscernible) the death of the two

21     women in the driving under the influence accident.

22     The inmate did have a weapon possession on 7/6/79.

23     He was out on bail at the particular time, on a

24     bond for the manslaughter charges.  The crime

25     itself occurred on 6/10/79.  He wasn't arrested

26     obviously, until later.  These conclusions are

27     **JIMMY MEJIA    C-10575    DECISION PAGE 1    4/28/05**

64

1    drawn from the Statement of Fact, wherein the

2    inmate, on or about the 12th of May 1978, during

3    driving under the influence, failed to stop for a

4    traffic signal at a high rate of speed.  He struck

5    a vehicle, killing 35-year-old Lisa Lopez and 74-

6    year-old Margarita Silva.  The charges were plea-

7    bargained.  He received a sentence for

8    manslaughter.  On 6/10/79, he shot and killed one

9    18-year-old Thomas Biddle, B-I-D-D-L-E.  The inmate

10   and his crime partner went to a location, in an

11   attempt to rip off or take down a dope dealer.

12   They were seen prior to them being able to do it.

13   They started to leave the scene.  They were

14   followed by Mr. Biddle.  The inmate stated he made

15   a remark that nobody had to get hurt, but

16   apparently as a result, he said that the inmate --

17   or the victim allegedly pulled a weapon.  Mr. Mejia

18   fired at this gentleman and wound up killing him.

19   The inmate was 27 years old at the time.  The

20   inmate does have a record of violence and

21   assaultive behavior, an escalating pattern of

22   criminal conduct and violence.  He has failed to

23   profit from society's previous attempts to correct

24   his criminality and that includes juvenile camp,

25   juvenile probation, a CYA commitment on two

26   occasions, CYA parole, adult probation, county

27   **JIMMY MEJIA    C-10575    DECISION PAGE 2    4/28/05**

65

1   jail, a prior prison term and parole.  As a

2   juvenile, he had an offense for taking a vehicle

3   without the owner's consent.  He was sent to CYA.

4   Released from CYA.  He had a record -- or had an

5   arrest for robbery.  He was sent back to CYA.

6   Released from CYA.  He had an attempt for -- or

7   assault with intent to commit murder, which was

8   dismissed, however, he was returned to CYA on a

9   probation violation.  As an adult, in 1971, he had

10  a burglary arrest and seven driving under the

11  influence convictions from 1972 to 1978.  And then

12  he had the manslaughter arrest along -- and that

13  was (indiscernible), so to speak, as far as

14  incarceration with the burglary that he had later.

15  And he served a prison term on both of those

16  particular crimes.  He was released from prison and

17  I might add that he has been on parole or probation

18  continuously since his 1971 arrest for burglary.

19  The inmate has done a remarkable job in the area of

20  programming.  He's received two 128(a) counseling

21  chronos during this time of his incarceration, the

22  last one in 2003 for unacceptable attitude.  Only

23  two 115s -- excuse me, five 115s, the last one in

24  1986 for under the influence of pruno.  The

25  psychological evaluation is not totally supportive

26  of release.  It's by Joe Livingston,

27  **JIMMY MEJIA    C-10575    DECISION PAGE 3    4/28/05**

66

1    L-I-V-I-N-G-S-T-O-N, on August 11th of 2003.   In

2    regards to the crime that the inmate had spent a

3    prison term for, which is the manslaughter, it was

4    the shooting of his wife that he claims was

5    accidental, the clinician says:

6            "This examiner experiences some

7            incredulity regarding the inmate's

8            accounts of the deaths of his two

9            shooting victims, for example, that

10           both were accidental.  The anticipated

11           explanation would be that the inmate

12           -- excuse me, was drinking and arguing

13           with his wife, grabbed his gun and

14           shot her.  For that -- for the instant

15           offense, the expected description

16           would be that he had been drinking,

17           had a gun and was being chased and/or

18           challenged by the victim and shot him.

19           The inmate could do some exploration

20           of this issue in his groups and

21           therapy.  Regarding a risk for future

22           violence, in this section, the Board's

23           request for discussion of the

24           prisoner's violence potential in the

25           free community, which will be

26           addressed utilizing objective

27    **JIMMY MEJIA    C-10575    DECISION PAGE 4    4/28/05**

67

1          measures, it should be noted that

2          these measures are identical to those

3          used in the previous report,

4          Rueschenberg, 6/20/02.  And

5          consequently, would not be expected to

6          change in such a short period of time,

7          due to the stable nature of the

8          instruments, as well as mentioned

9          above, the higher (indiscernible)

10         reliability.  Nevertheless, this

11         examiner re-scored those instruments,

12         with the result that all outcomes were

13         in agreement from all instruments,

14         indicating a moderate level of risk

15         for future violence by the inmate in

16         the free community."

17   The inmate has realistic parole plans in the area

18   of residence, however, nothing in employment.

19   However, he does have quite a few marketable

20   skills.  However, there was a discussion at today's

21   hearing in regards to him being paroled to a

22   lockdown type of facility, due to his record of

23   intoxication, both by alcohol and illicit drugs.

24   The hearing Panel notes that responses to 3042

25   notices indicate an opposition to a finding of

26   parole suitability.  Specifically, the District

27   **JIMMY MEJIA    C-10575    DECISION PAGE 5    4/28/05**

68

1    Attorney of Los Angeles County, present today to

2    voice opposition to parole suitability.  And the LA

3    County Sheriff's Department, voicing opposition by

4    way of a letter submitted for this hearing.  The

5    Panel makes the following findings.  The inmate

6    needs additional time in order to fully understand

7    and deal with the consequences of his acts.

8    Nevertheless, he should be commended for his

9    involvement in AA and NA, for having no 115s since

10   1995 -- excuse me, since 1986, for his self-help

11   programming, for his receiving his high school

12   diploma and for completing vocational Welding,

13   vocational Plumbing, vocational Mechanical Drawing

14   and vocational Sewing Machine Repair.  However,

15   those positive aspects of his behavior do not

16   outweigh the factors of unsuitability.  The denial

17   is for a period of one year.  During that one year,

18   we ask that you stay disciplinary free, continue in

19   what you're doing.  Now, the last psychological

20   evaluation that was done still has you has

21   moderate.  That's of concern to us.  He indicates

22   that he doubts if it were to change from the

23   previous one, which I think was one or two years.

24   We're going to ask for a new psychological

25   evaluation in that area all by itself again, which

26   will make it a little bit longer this time, all

27   **JIMMY MEJIA    C-10575    DECISION PAGE 6    4/28/05**

69

1    right.  So hopefully, there may be a change

2    registered, I don't know.  But without a

3    psychological evaluation that clears you, I can

4    tell you right now, no matter what we do, you

5    aren't going to go any place.  Let me make one

6    suggestion.  The last time, we talked about a

7    lockdown facility.  Let me give you some -- just

8    one thing I think you should look at for this next

9    time.  Make contact with a place called Delancey

10   Street.

11            INMATE MEJIA:  I --

12            PRESIDING COMMISSIONER ANGELE:  Have you

13   heard of them?

14            INMATE MEJIA:  I have.  I've made contact

15   with them.  They don't accept somebody until

16   they're out also.

17            PRESIDING COMMISSIONER ANGELE:  Okay.

18            INMATE MEJIA:  And then it's not guaranteed

19   they will accept you.

20            PRESIDING COMMISSIONER ANGELE:  I understand

21   that.  But it's a good program.

22            INMATE MEJIA:  Yes.

23            PRESIDING COMMISSIONER ANGELE:  I visited

24   the facility in San Francisco before they moved to

25   Los Angeles and over in Los Angeles, but that's the

26   type of facility I think you belong in.  I really

27   **JIMMY MEJIA    C-10575    DECISION PAGE 7    4/28/05**

70

1    do.   It's rehabilitative also in areas other than

2    intoxication and you learn all sorts of things.

3    Regardless, that's where we are at this point.

4    Hopefully, the next psychological evaluation will

5    bring you down a little bit.

6            **INMATE MEJIA:**  Can I comment on that?

7            **PRESIDING COMMISSIONER ANGELE:**  Please go

8    right ahead.

9            **INMATE MEJIA:**  Dr. Livingston or -- yeah,

10   Dr. Livingston said that no matter what I get, I'm

11   always going to be at a moderate.   It's never going

12   to change.   And I don't know if you are familiar

13   with Dr. Essres coming to a BPT hearing, Rhiney's

14   (phonetic) hearing and saying that no matter if you

15   have an extensive criminal background like I have,

16   you are never going to get any better than a

17   moderate.

18           **PRESIDING COMMISSIONER ANGELE:**  Well, with

19   the -- with the Psychopathy Checklist -- and there

20   are areas that will never change, I understand

21   that.   When you get to the point of being a low,

22   moderate, you know, it gives us a better

23   indication.   We do have -- I have talked to

24   psychologists who have indicated to me -- of

25   course, you could be a saint and some things are

26   never going to change.

27   **JIMMY MEJIA    C-10575    DECISION PAGE 8    4/28/05**

71

1        **INMATE MEJIA:**  Yeah.

2        **PRESIDING COMMISSIONER ANGELE:**  And that has

3   to do with your past history.  But the Psychopathy

4   Checklist has to do with past, present and future.

5   The past portion may never change, but the present

6   and future can, which can drag that -- the moderate

7   down to -- it may be moderate in one section, but

8   you may be able to get that down to low or low,

9   moderate in the other areas too.  But it's

10  something that I think we need to very honestly

11  look at, since we have two psychologists in two

12  different reports saying the same thing.  But we

13  realize that.  We do realize that.

14       **INMATE MEJIA:**  Are you just going to ask

15  them to evaluate me on the moderate level, to see

16  if it's going to be lowered or is there going to be

17  other issues (inaudible)?

18       **PRESIDING COMMISSIONER ANGELE:**  We're going

19  to ask him to specifically (indiscernible) on the

20  Assessment of Dangerousness level, yes.

21       **INMATE MEJIA:**  Okay.  And that's the only

22  issue?

23       **PRESIDING COMMISSIONER ANGELE:**  That's the

24  only issue that we have, yes.

25       **INMATE MEJIA:**  Okay.  That -- all right.

26       **PRESIDING COMMISSIONER ANGELE:**  All right?

27  **JIMMY MEJIA    C-10575    DECISION PAGE 9    4/28/05**

72

1          INMATE MEJIA:  All right.

2          PRESIDING COMMISSIONER ANGELE:  Any

3   comments, Commissioner Rodriguez?

4          DEPUTY COMMISSIONER RODRIGUEZ:  I just want

5   to commend you for your positive program.  You have

6   done a lot.

7          INMATE MEJIA:  Okay.

8          DEPUTY COMMISSIONER RODRIGUEZ:  Good luck,

9   sir.  Keep it up.

10          INMATE MEJIA:  Thank you.

11          PRESIDING COMMISSIONER ANGELE:  All right.

12   That does conclude this hearing.  The time is

13   approximately 1:08 p.m.  Good luck to you, sir.

14          INMATE MEJIA:  Oh, will I be coming back

15   before you?

16          PRESIDING COMMISSIONER ANGELE:  Me,

17   personally?

18          INMATE MEJIA:  Yes.

19          PRESIDING COMMISSIONER ANGELE:  I have no

20   idea.

21          INMATE MEJIA:  Since you recommended that I

22   get a new evaluation, I would think that, you know,

23   when I come back again, you would want to see that.

24          PRESIDING COMMISSIONER ANGELE:  Well, utopia

25   would be that one of the -- one of the individuals

26   at this side of the table would be present at your

27   JIMMY MEJIA   C-10575   DECISION PAGE 10   4/28/05

73

1    next hearing.  But in reality, who knows who's

2    going to be here a year from now.

3              **INMATE MEJIA:**  Yeah.  All right.

4              **PRESIDING COMMISSIONER ANGELE:**  I'd like to

5    be, but I don't do the scheduling.

6              **INMATE MEJIA:**  Okay.

7              **PRESIDING COMMISSIONER ANGELE:**  All right,

8    sir.

9              **DEPUTY COMMISSIONER RODRIGUEZ:**  Good luck.

10             **INMATE MEJIA:**  Thank you.

11                        --o0o--

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON:** _____.

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **JIMMY MEJIA   C-10575.  DECISION PAGE 11   4/28/05**

74

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 73, and which recording was duly recorded at CALIFORNIA MEN'S COLONY, at SAN LUIS OBISPO, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JIMMY MEJIA, CDC No. C-10575, on APRIL 28th, 2005, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 14th, 2005, at Sacramento County, California.

_____
Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT 2

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA

## SETTING A LIFE PRISONER TERM - PAROLE DENIED

## 11. NOTE TO CDC STAFF: RECOMMENDATIONS AND REQUESTS

The panel requests that CDC:

☐ A. complete a clinical evaluation based upon:

    ☐ 1. the panel's belief that there has been a substantial change in the prisoner's mental status since the last evaluation. The panel bases this conclusion upon

_____

_____

_____

    ☐ 2. the panel's need for elaboration of the following issue(s) _____

_____

_____

    ☐ 3. the panel's belief that the prisoner's current mental health is an important issue. In the new full evaluation, the panel requests that the clinician specifically address the following:

        ☐ a. the prisoner's violence potential in the free community;

        ☐ b. the significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released;

        ☐ c. the prisoner's psycho-sexual problems;

        ☐ d. the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;

        ☐ e. the need for further therapy programs while incarcerated.

        ☑ f. other: _SINGLE ISSUE REQUEST_
        _ASSESSMENT OF DANGEROUSNESS_

MEJIA, JIMMY  C-10575   CMC-E                    4-18-05

# EXHIBIT 3

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


**INMATE COPY**

In the matter of the Life      )
Term Parole Consideration      )      CDC Number C-10575
Hearing of:                    )
                               )
JIMMY MEJIA                    )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

OCTOBER 25, 2006

9:15 a.m.


PANEL PRESENT:

Belinda Harris-Ritter, Presiding Commissioner
Robert Harmon, Deputy Commissioner


OTHERS PRESENT:

Jimmy Mejia, Inmate
Marcia Hurst, Attorney for Inmate
Patrick Sequeira, Deputy District Attorney, Los Angeles
Two Correctional Officers Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No          See Review of Hearing
_____    Yes         Transcript Memorandum


**Tena Olvera      Northern California Court Reporters**

ii

## INDEX

Page

Proceedings .............................................. 1

Case Factors ............................................. 5

Pre-Commitment Factors ................................... 6

Post-Conviction Factors ................................. 15

Parole Plans ............................................ 29

Closing Statements ...................................... 45

Recess .................................................. 57

Decision ................................................ 58

Adjournment ............................................. 61

Transcriber Certification ............................... 63

--oOo--

1

**P R O C E E D I N G S**

1    **DEPUTY COMMISSIONER HARMON:  And you**'re on

2    record.

3    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

4    you.  This is a subsequent parole consideration hearing

5    for Jimmy Mejia, CDC Number C10575.  Today's date is

6    October 25, 2006, and the time is 9:15 a.m.  We are

7    located at CTF Soledad.  The inmate was received on

8    November 16, 1979, from Los Angeles County. The life

9    term began on November 16, 1979 and the minimum

10   eligible parole date is March 17, 1987.  The

11   controlling offense for which the inmate has been

12   committed is murder in the second degree, Los Angeles

13   County Case A524887, Count One, Penal Code Section 187.

14   Mr. Mejia, the hearing is being tape-recorded and for

15   the purpose of voice identification we will go around

16   the room, each of us will say our name and spell our

17   last name, and when we get to you, if you could also

18   please give us your CDC number after you spell your

19   last name, we would really appreciate it. Okay?

20   **INMATE MEJIA:**  Okay.

21   **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

22   right.  I will begin and then we'll go to my left.  I'm

23   Belinda Harris-Ritter, H-A-R-R-I-S-R-I-T-T-E-R,

24   Commissioner, Board of Parole Hearings.

25   **DEPUTY COMMISSIONER HARMON:**  Robert Harmon, H-A-

26   R-M-O-N, Deputy Commissioner.

2

1          DEPUTY DISTRICT ATTORNEY SEQUEIRA:  Patrick

2     Sequeria, S-E-Q-U-E-R-I-A, Deputy District Attorney,

3     County of Los Angeles.

4          ATTORNEY HURST:  Marcia Hurst, H-U-R-S-T,

5     counsel for Mr. Mejia.

6          INMATE MEJIA:  Jimmy Mejia, M-E-J-I-A, C10575.

7          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

8     you.  We also have two correctional peace officers in

9     the room for security purposes.  Mr. Mejia, I see that

10    on June 15, 2006, you signed the BPT 1073 form

11    indicating that you don't have any disabilities that

12    would interfere with you going forward with your

13    hearing today.  Is that still correct?

14         **INMATE MEJIA:**  Yes.

15         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

16    right.  There is a paragraph in front of you that's

17    taped down on the table.  If you could read that out

18    loud into the record for us, we can dispense of the ADA

19    issue.

20         **INMATE MEJIA:**  All right.

21                    Americans with Disabilities Act (ADA)

22               is a law to help people with disabilities.

23               Disabilities are problems that make it harder

24               for some people to see, hear, breathe, talk,

25               walk, learn, think, work or take care of

26               themselves than it is for others. Nobody can

27               be kept out of public places or activities

1          because of a disability.  If you have a
2          disability, you have a right to ask for help
3          to get ready for your BPT hearing, reading
4          forms and papers and and understand the
5          hearing process.  BPT will look at what you
6          ask for to make sure that you have a
7          disability that is covered by the ADA and
8          that you have asked for the right kind of
9          help.  If you do not get help or if you don't
10         think you got the kind of help you need, ask
11         for a BPT 1074 grievance form.  You can also
12         get help to fill it out.

13    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank
14    you.  And I just have a couple of questions to ask,
15    that we ask everyone related to the ADA issue.  Do you
16    have any problem walking up or down stairs, or
17    distances of one hundred yards or more?

18    **INMATE MEJIA:**  No, I don't.

19    **PRESIDING COMMISSIONER HARRIS-RITTER:**  And I do
20    note that you're wearing glasses.  Are they sufficient
21    for you to see and read documents for this hearing?

22    **INMATE MEJIA:**  Yes.

23    **PRESIDING COMMISSIONER HARRIS-RITTER:**  And do
24    you have any hearing impairments?

25    **INMATE MEJIA:**  No, I don't.

26    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Have you
27    ever been included in the Triple CMS program?

4

1          **INMATE MEJIA:**  Yes, I have.

2          **PRESIDING COMMISSIONER HARRIS-RITTER:**  And do

3    you recall approximately when that was?

4          **INMATE MEJIA:**  Three years ago, I think.

5          **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

6    right.  And have you ever been in the enhanced

7    outpatient program?

8          **INMATE MEJIA:**  No.

9          **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

10   right.  And have you ever taken any psychopathic

11   medication in prison or on the street.

12         **INMATE MEJIA:**  I'm taking Remeron.

13         **PRESIDING COMMISSIONER HARRIS-RITTER:**  And did

14   they indicate what that's for?

15         **INMATE MEJIA:**  Sleep.

16         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

17   And do you have any disability that you believe would

18   prevent you from participating in today's hearing?

19         **INMATE MEJIA:**  No, I don't.

20         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

21   right.  Counsel, are there any ADA issues that you

22   think need further discussion?

23         **ATTORNEY HURST:**  No, your honor.

24         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

25   right, thank you.  Mr. Mejia, we will reach a decision

26   today and inform you whether or not we find you

27   suitable for parole.  We'll tell you the reasons for

5

1  our decision. If you are found suitable for parole, the
2  length of the confinement will be explained to you.
3  Before we recess the hearing to deliberate on our
4  decision, the District Attorney's representative, your
5  attorney and you will be given an opportunity to make a
6  final statement regarding your suitability. We will
7  then recess, clear the room and deliberate.
8                 TAPE GOES BLANK HERE, then starts with
9                           DECISION portion
10                              -oOo-
11                    TAPE STARTS BACK UP HERE
12                    FOLLOWING DECISION:
13      **INMATE MEJIA:**  - - went with the intent to
14  commit a robbery on the drug dealer when this victim,
15  Thomas Biddle, was notified by (inaudible).  My crime
16  partner stopped downstairs before I entered the
17  apartment, and he let him go and when he let the kid
18  go, I decided not to go through with the robbery and we
19  ran back to the car and the young kid had notified
20  Thomas Biddle and they pursued us and when he was
21  approximately fifty feet from me, I asked him to let me
22  go, we don't need to hurt each other, and he kept
23  advancing and he raised his weapon and he fired three
24  shots over his head. As a result of me firing shots as
25  he turned and ran, one of the shots hit him in the back
26  of the shoulder and he died running away form me. I
27  didn't know I shot him, because he kept running.

6

1       **PRESIDING COMMISSIONER HARRIS-RITTER:**   Okay.

2   And you indicated you were there in a drug-related

3   capacity.

4       **INMATE MEJIA:**   Yes, I was intending on robbing a

5   drug dealer that lived in the apartment building.

6       **PRESIDING COMMISSIONER HARRIS-RITTER:**   And how

7   did you know the drug dealer?

8       **INMATE MEJIA:**   I had met the drug dealer before

9   and several people knew this person.

10      **PRESIDING COMMISSIONER HARRIS-RITTER:**   Were you

11  a customer?

12      **INMATE MEJIA:**   Well, I'd bought from this person

13  one time.

14      **PRESIDING COMMISSIONER HARRIS-RITTER:**   So, when

15  you were buying and using drugs, you were also selling

16  drugs?

17      **INMATE MEJIA:**   Occasionally I would buy big

18  quantities and sell, not often.

19      **PRESIDING COMMISSIONER HARRIS-RITTER:**   We note

20  that your criminal history started when you were a

21  juvenile.  Is that correct?

22      **INMATE MEJIA:**   Yes.

23      **PRESIDING COMMISSIONER HARRIS-RITTER:**   And your

24  first arrest was when you were ten years old?

25      **INMATE MEJIA:**   I can't remember that far back,

26  but if the record says it's ten years old, then it'

27  ten.

7

1      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Do you

2   remember what it was for?

3      **INMATE MEJIA:**  No, I don't.

4      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  I

5   show the juvenile record includes vehicle theft, for

6   which you were committed to the California Youth

7   Authority in 1966, and that you were re-committed to

8   CYA in 1967 for robbery.  Do you remember those?

9      **INMATE MEJIA:**  Yes, I do, but I wasn't ten years

10  old at that time.

11      **PRESIDING COMMISSIONER HARRIS-RITTER:**  No, I

12  understand that.  It says you were arrested when you

13  were ten.  I'm looking at, these are convictions.  Were

14  you detained at juvenile hall more than once?

15      **INMATE MEJIA:**  Yes.

16      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And did

17  you have more than one term in California Youth

18  Authority.

19      **INMATE MEJIA:**  Yes.

20      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Were you

21  ever on juvenile probation?

22      **INMATE MEJIA:**  I think I was.

23      **PRESIDING COMMISSIONER HARRIS-RITTER:**  I see in

24  '66 you were paroled after going to juvenile court.  Do

25  you recall that?

26      **INMATE MEJIA:** What?

27      **PRESIDING COMMISSIONER HARRIS-RITTER:**  In 1966,

8

1    I think that was following the vehicle theft.

2        **INMATE MEJIA:**  Yeah, I was paroled then.

3        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay. And

4    then you were paroled again in 1969 after being at CYA

5    on the 1967 incident?

6        **INMATE MEJIA:**  Yeah.

7        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

8    And then as an adult, 1970, there was an assault with

9    an intent to commit murder?  You were returned to CYA

10   for a parole violation. Can you tell us what happened

11   there?

12       **INMATE MEJIA:**  I was returned as a parole

13   violator because my parole officer felt that I knew who

14   shot this guy and I didn't come forward. I was, I

15   witnessed somebody get shot and I left because I didn't

16   have nothing to do with it, and I got arrested for it.

17       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, and

18   then the charges were dismissed and you were returned

19   to CYA as a parole violator.  And then there was a 1971

20   burglary in Baldwin Park.  You got probation.  That was

21   a felony?

22       **INMATE MEJIA:**  Yeah.

23       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And then

24   drunk driving in 1972, 24 months summary probation.

25   Remember that one?

26       **INMATE MEJIA:**  Yeah.

27       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And then

9

1   there was another drunk driving in January of '73.  Do
2   you remember that?

3       **INMATE MEJIA:**  Yeah.

4       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And
5   another drunk driving in July of '73. And another drunk
6   driving in November of '73. Do you remember that one?
7   You had 30 days in county jail for that one.

8       **INMATE MEJIA:**  Yes.

9       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And then
10  in January of '74, another drunk driving. Do you recall
11  that one?

12      **INMATE MEJIA:**  Yes.

13      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And then
14  May 12, 1974, assault to commit murder. You got a six
15  month to sixteen years consecutive with six months to
16  life in state prison. What was that related to?

17      **INMATE MEJIA:**  I shot my common-law wife.

18      **PRESIDING COMMISSIONER HARRIS-RITTER:**  And she
19  died, right?

20      **INMATE MEJIA:**  Yes.

21      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.
22  And then in May of '77, which was a month after you
23  were out of jail, right? You were paroled on April 14,
24  1977, and then May 28, 1977, there was a burglary
25  charge filed which was dismissed and you pled guilty to
26  a health and safety violation.

27      **INMATE MEJIA:**  Yes.

10

1    **PRESIDING COMMISSIONER HARRIS-RITTER:** What was

2    that?

3    **INMATE MEJIA:** I went down to a friend's house

4    and I happened to walk in when the police were already

5    around his house to arrest him and they arrested me for

6    burglary because he ran out the back door.

7    **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay,

8    what was the health and safety violation?

9    **INMATE MEJIA:** The health and safety violation

10   was the possession of narcotics paraphernalia.

11   **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay.

12   And then December 21, 1977, there was another drunk

13   driving conviction and six days in jail and 24 months

14   probation. Is that right?

15   **INMATE MEJIA:** Yes.

16   **PRESIDING COMMISSIONER HARRIS-RITTER:** And then

17   October 14, 1978, drunk driving under the influence of

18   narcotics.

19   **INMATE MEJIA:** Yes.

20   **PRESIDING COMMISSIONER HARRIS-RITTER:** And isn't

21   it in one of those drunk driving incidents that some

22   people were killed?

23   **INMATE MEJIA:** I think it was after the arrest

24   in driving (inaudible).

25   **PRESIDING COMMISSIONER HARRIS-RITTER:** In 1978,

26   the last one?

27   **INMATE MEJIA:** Yes.

11

1    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Two

2    people were killed?

3    **INMATE MEJIA:**  Yes.

4    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  Is

5    there anything else you want to tell me about your

6    prior criminal history before we move on to your social

7    background?

8    **INMATE MEJIA:**  Well, other than what's in the

9    record, unless you got anything specifically you want

10   to ask me.

11   **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

12   You were born and raised in East Los Angeles?

13   **INMATE MEJIA:**  Yes, I was.

14   **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

15   right.  And how many brothers and sisters did you have?

16   **INMATE MEJIA:**  I have one-half brother and one

17   half-sister.

18   **PRESIDING COMMISSIONER HARRIS-RITTER:**  And did

19   you all grow up together?

20   **INMATE MEJIA:**  No, they were older. My brother

21   and sister are 16 and 17 years older than me.

22   **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.  So

23   what was your life like growing up in your home?

24   **INMATE MEJIA:**  Well, my mother and father have

25   always been married.  They weren't ever divorced.  I

26   was never abused. My father provided well for the

27   family, he was always (inaudible).

12

1        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Did you

2    become involved with gangs?

3        **INMATE MEJIA:**  As a teenager, yes.

4        **PRESIDING COMMISSIONER HARRIS-RITTER:**  And what

5    gang was it?

6        **INMATE MEJIA:**  I belonged to a (inaudible).

7        **PRESIDING COMMISSIONER HARRIS-RITTER:**  I see.

8    And did your gang involvement coincide with your

9    criminality?

10       **INMATE MEJIA:**  Yeah.

11       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

12   right.  And how did you do in school?

13       **INMATE MEJIA:**  Well, as a result of my criminal

14   behavior as a youngster, I didn't fair too well in

15   school.

16       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Did you

17   drop out?

18       **INMATE MEJIA:**  Yes, I dropped out.  Well, I

19   dropped out after I was sent to Youth Authority.

20       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

21   And when did you start using drugs?

22       **INMATE MEJIA:**  I started experimenting with

23   drugs, I guess about 14.

24       **PRESIDING COMMISSIONER HARRIS-RITTER:**  And how

25   about alcohol?

26       **INMATE MEJIA:**  I started maybe about the same

27   time.

13

1     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

2  What drugs did you use?

3     **INMATE MEJIA:**  I started out with marijuana, and

4  reds and bennies.

5     **PRESIDING COMMISSIONER HARRIS-RITTER:**  What

6  about heroin?

7     **INMATE MEJIA:**  I didn't start heroin until, I

8  don't know, it must have been about 16, 17.  It could

9  have been 18.

10     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

11  And your (inaudible).

12     **INMATE MEJIA:**  No.

13     **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

14  right.  And then, how many children do you have?

15     **INMATE MEJIA:**  Five.

16     **PRESIDING COMMISSIONER HARRIS-RITTER:**  And are

17  you in contact with your children?

18     **INMATE MEJIA:**  Yes.

19     **PRESIDING COMMISSIONER HARRIS-RITTER:**  And what

20  kind of contact?  Phone calls, letters, visits?

21     **INMATE MEJIA:**  Phone calls, letters.

22     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Do they

23  come visit you at all?

24     **INMATE MEJIA:**  No.

25     **PRESIDING COMMISSIONER HARRIS-RITTER:**  And are

26  you divorced now?

27     **INMATE MEJIA:**  Yes.

14

1          **PRESIDING COMMISSIONER HARRIS-RITTER:**  From Lisa

2     Hernandez?

3          **INMATE MEJIA:**  Yes.

4          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Any other

5     marriages besides - -

6          **INMATE MEJIA:**  I was married three times

7     (inaudible).

8          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

9     All right. Is there anything else that you want to tell

10    me about your social background before we move on to

11    post-conviction factors?

12         **INMATE MEJIA:**  Well I have (inaudible).

13         **PRESIDING COMMISSIONER HARRIS-RITTER:**  Because

14    sometimes we don't have everything in the record and

15    sometimes it's not correct so I want to give you the

16    chance to add to it or correct anything.

17         **INMATE MEJIA:**  Pretty much we've covered

18    everything.

19         **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

20    right.  Then at this time I'm going to turn the hearing

21    over to Commissioner Harmon.  He's going to talk to you

22    about post-conviction factors and things that have

23    occurred since you came to prison.

24         **DEPUTY COMMISSIONER HARMON:**  Yes, good morning.

25         **INMATE MEJIA:**  Good morning.

26         **DEPUTY COMMISSIONER HARMON:**  What we're going to

27    do is make sure the record is correct.  Listen very

1    carefully, I'm going to use the counselor's report as
2    reference.  It does show that your last hearing was
3    April 28, 2005.  At that time you received a one-year
4    denial.  That would have been subsequent hearing number
5    seven.  You were received at CTF November 15 of 2005
6    from CMC.  You have a custody level today of Medium A
7    and are a revised Class score of 19.  Does that sound
8    right to you?

9         **INMATE MEJIA:**  Yes.

10        **DEPUTY COMMISSIONER HARMON:**  Okay.  We are going
11   to focus primarily on the period of time since your
12   last hearing and the way I'm going to do that is I'm
13   going to use your counselor's report as a reference and
14   it may leave out areas that are important to you and
15   your attorney here, so listen carefully and I'll report
16   on the counselor's report, and it says that from April
17   28 of '05 to the present which is dated July 12th of
18   '06, it says during this period of time you remained at
19   CMC until transferred to CTF and it was a non-adverse
20   transfer. You are in the general population, custody
21   remained at Medium A, there was no vocational training,
22   no academics.  You worked in the T-shirt factory at CMC
23   and as an apprentice plumber at CTF.  It says that you
24   received average work reports based on a couple
25   chronos.  It says that you received a 128b laudatory
26   chrono marking your participation in the noted courses
27   including January '06, regular attendance at AA

16

1    meetings since September of '90. You completed the

2    alternatives to violence project based on a chrono

3    dated July 18 of '05 and the IFA (phonetic) course on a

4    chrono dated September 26, '05, and a sexually

5    transmitted disease program chrono dated October 20 of

6    '05. It shows a 128c dated November 29 of '05. It

7    shows that you were in the mental health program at the

8    Triple CMS level of care and you are at that point

9    taking psychotropic medications as prescribed. There

10   is no discipline and the counselor drops it off at July

11   12 of '06, so from July 12 until today can you kind of

12   give us an idea of what activities you are in, working

13   at?

14   **INMATE MEJIA:** Well I continue to go to AA. I'm

15   also involved in the alternatives to violence project.

16   I helped facilitate to-date eight workshops here in

17   CMC. I've recently done two workshops here since they

18   brought the program here to CTF and I participate in

19   buddest study meditation, and I'm recently enrolled in

20   a college program here, Coastline. I have 12 units to

21   graduate before I get an AA degree in general study and

22   of course, I'm working as a plumber.

23   **DEPUTY COMMISSIONER HARMON:** Okay, and are you

24   still participating in buddest?

25   **INMATE MEJIA:** Yes, I am.

26   **DEPUTY COMMISSIONER HARMON:** And that's been

27   going on for how long?

17

1      **INMATE MEJIA:** About 14, 15 years.

2      **DEPUTY COMMISSIONER HARMON:** Okay.  Do you

3   recreate at all?  Do you go out into the yard?

4      **INMATE MEJIA:** Yes, I do.

5      **DEPUTY COMMISSIONER HARMON:** And what do you do

6   when you get out there for recreation?

7      **INMATE MEJIA:** I walk around or I run track.  I

8   also do tai chi.

9      **DEPUTY COMMISSIONER HARMON:** Okay.  In the area

10  of vocations, you've completed the sewing machine

11  repair program?

12     **INMATE MEJIA:** Yes.

13     **DEPUTY COMMISSIONER HARMON:** You've completed

14  the welding program?

15     **INMATE MEJIA:** Yes.

16     **DEPUTY COMMISSIONER HARMON:** You've completed

17  the data processing program?

18     **INMATE MEJIA:** Yes.

19     **DEPUTY COMMISSIONER HARMON:** And I think that -

20     **INMATE MEJIA:** Drafting.

21     **DEPUTY COMMISSIONER HARMON:** Drafting. And what

22  year was the drafting in?

23     **INMATE MEJIA:** I believe it was in '96 to '97.

24     **DEPUTY COMMISSIONER HARMON:** Okay.  You've held

25  various jobs and I'm just going to take a few of the

26  jobs.  You've been in the TIA programs like T-shirt,

27  you've been in mechanical maintenance, sewing machine

1    vocational programs, clerical positions, optical lab.

2            **INMATE MEJIA:**  Not optical lab.

3            **DEPUTY COMMISSIONER HARMON:**  You haven't been in

4    the optical lab?

5            **INMATE MEJIA:**  No.

6            **DEPUTY COMMISSIONER HARMON:**  Okay, I'll check

7    that.  Have you done any work as a video tech?

8            **INMATE MEJIA:**  No, I haven't.

9            **DEPUTY COMMISSIONER HARMON:**  And one of the

10   places I have for you, although you've been receiving

11   satisfactory grades, some of the things that I have

12   noted from the last couple years is you've been

13   downgraded in your attitude toward your supervisor and

14   interest in your assigned work, as you know, from your

15   grades.

16           **INMATE MEJIA:**  Well that was in CMC and I think

17   if you read the chrono, it would mention that because I

18   was on interferon treatment for my liver and it gave me

19   mood swings and as a result of the mood swings I had

20   this, the attitude problem with my supervisor.

21           **DEPUTY COMMISSIONER HARMON:**  Yeah, I noted that.

22   And I wanted to ask you about that, because mood swings

23   can carry to the outside and of course, you'd have a

24   parole officer out there.  Let me - -

25           **INMATE MEJIA:**  Well, I - -

26           **DEPUTY COMMISSIONER HARMON:**  I haven't ask the

27   question yet.  How are the mood swings going to affect

1    a relationship with a parole supervisor when it's very

2    obvious that there is instability there?

3        **INMATE MEJIA:** Well, the mood swings, I went to

4    the psyche department myself. I put in for that

5    myself. Not as a result of staff (inaudible) because I

6    recognize that problem I had myself because when I was

7    on medication, I noticed the effect of it having on me

8    personally, on my body. And when I started getting

9    these mood swings, I immediately went to the psyche

10   department and asked them to help me and they placed me

11   on Remeron for the mood swings. In the past, I

12   wouldn't have been able to do that because I would have

13   been too much involved in my criminal thinking and I

14   can handle it myself or pass it on, and the difference

15   now is that I can seek the help.

16       **DEPUTY COMMISSIONER HARMON:** Yeah, this is not

17   new though. I've gone back over the psyche reports for

18   a long time and, as an example, even in June of '91,

19   it's addressed in there in the intake.

20       **INMATE MEJIA:** Where is it addressed, I don't

21   know - -

22       **DEPUTY COMMISSIONER HARMON:** Okay, Dr. Orling,

23   O-R-L-I-N-G, back in '91.

24       **INMATE MEJIA:** What specifically is he referring

25   to?

26       **DEPUTY COMMISSIONER HARMON:** Well, it just talks

27   about under the intake summary, it's showing in there

20

1   that the Doctor said 'psychological testing reflects a
2   mild anti-social personality disorder with difficulties
3   in having problems with authority figures and over-
4   controlled hostility, anti-social practices and
5   narcissism are evidence.

6       **ATTORNEY HURST:** Is that category T-Intake?
7       **DEPUTY COMMISSIONER HARMON:** Yes.

8       **ATTORNEY HURST:** Is there another report at the
9   conclusion of the - -

10      **DEPUTY COMMISSIONER HARMON:** Yeah, my question
11  is, I'm just asking him, in other words it's not
12  something that just popped up, it's something that's -

13      **INMATE MEJIA:** I obviously had an anti-social
14  personality disorder when I came in and that didn't
15  just change over night. We're looking at now 27 years
16  later, considering what I've been through in here.

17      **DEPUTY COMMISSIONER HARMON:** And I'm looking at
18  work reports in '05.

19      **INMATE MEJIA:** But the difference is, I sought
20  help in '05.

21      **DEPUTY COMMISSIONER HARMON:** But my point is
22  that the problem persists and my question to you is, is
23  it going to create an issue on the outside?

24      **INMATE MEJIA:** No, it's not.

25      **DEPUTY COMMISSIONER HARMON:** Okay. Let's talk
26  about, you talked to the Commissioner here. You
27  graduated from high school in about '70, from the Youth

1   Training School, is that right?

2          **INMATE MEJIA:**  Yes.

3          **DEPUTY COMMISSIONER HARMON:**  And I found a tape
4   score from 2000, it showed a reading level of 8.6 and a
5   GPO of 8.6.  Some of the self-help group programs,
6   you're an inmate pier educator.  We talked about that
7   you've been doing the (inaudible) on hepatitis.  You've
8   done some other stuff there.  You've been participating
9   in the personal growth seminars, which include anger
10  management and that, the alternatives to violence, the
11  basic advance in the trainer's workshop.  You've been
12  through the Cad-X (phonetic) program, and how about
13  some of your other accomplishments in the last five
14  years, other than AA, we're going to talk about AA in
15  just a minute.  You think you've been in that since
16  about '90 right, and recognized for your participation
17  in there.

18         **INMATE MEJIA:**  I been in that longer than '90.

19         **DEPUTY COMMISSIONER HARMON:**  Okay.

20         **INMATE MEJIA:**  I'd say about '85 r '84, I came
21  to AA.

22         **DEPUTY COMMISSIONER HARMON:**  Okay.  Has it been
23  continuous since that time, or - -

24         **INMATE MEJIA:**  Yes, it has.

25         **DEPUTY COMMISSIONER HARMON:**  Do you know all 12
26  steps.

27         **INMATE MEJIA:**  Yes, I do.

22

1    **DEPUTY COMMISSIONER HARMON:**  Do you practice

2    them on a regular basis?

3        **INMATE MEJIA:**  Yes, I do.

4        **DEPUTY COMMISSIONER HARMON:**  Okay.  You've had

5    five 115s, your last one March 1 of '86, for being

6    under the influence of alcohol.

7        **INMATE MEJIA:**  Yes.

8        **DEPUTY COMMISSIONER HARMON:**  Okay.  And two

9    128s, the last one April 24 of '03 for failure to obey

10   orders.  Let's see here. It should be pointed out that

11   in '86 you had a couple of violations, and in one part

12   of that, it looks like the same day, was for resisting

13   a peace officer and then the others were intoxication

14   in the unit in '82, possession of prison made wine in

15   '80, refusing to perform duties in '83, and those are,

16   that's kind of a summation of the 115s.  I also found

17   in there, and of course it's commendable you haven't

18   had a 115 since '86, and I want to point that out.  You

19   completed the advance sign language for your bible

20   studies in '01, or you're doing that, is that right?

21   Is this another area?

22       **INMATE MEJIA:**  Yes.

23       **DEPUTY COMMISSIONER HARMON:**  What other areas of

24   emphasis in terms of self-help and group have I left

25   out, or is that an over-view of your events?

26       **INMATE MEJIA:**  Other than that, I helped teach a

27   yoga class here, I teach it here.

23

1    **DEPUTY COMMISSIONER HARMON:**  Anything else?

2    **INMATE MEJIA:**  Other than that, it's all I been

3    doing.

4    **DEPUTY COMMISSIONER HARMON:**  Okay.  We're going

5    to go into your doctor's report.  Before we do, I want

6    to ask you a couple real important questions, and the

7    first one is: do you believe you still pose a risk to

8    the safety of the people outside the prison walls

9    today?

10    **INMATE MEJIA:**  No, I don't.

11    **DEPUTY COMMISSIONER HARMON:**  Okay, and of

12    course, my job here is to address the post-conviction

13    factors, so what do you believe makes you a different

14    man today then the man that came into prison for the

15    life crime?

16    **INMATE MEJIA:**  Well, the man that came in to

17    prison for the life crime was a very irresponsible. He

18    was young, he just didn't know how to live life, live

19    his life like a productive citizen out there.  Today,

20    I'm no longer the same person.  I've upgraded myself

21    vocationally and educationally, I've attended AA and I

22    have in the past attended NA also.  And I've gone to

23    numerous self-help programs to help me deal with my

24    anti-social personality and I'm older and I'm tired of

25    doing time.  You have to get tired of doing your time

26    to want to change, and I'm tired of hurting myself and

27    many people.  And I'm sorry for destroying so many

24

1    lives. I mean, the record speaks for itself. I can
2    never change the past. I can only change here and in
3    the future. And one way of making amends is not being
4    the same person you were back then when I came in. And
5    as my record shows, I've made the effort to change
6    myself so I'm not that same person any more.
7        **DEPUTY COMMISSIONER HARMON:** Did you complete a
8    thought?
9        **INMATE MEJIA:** Yes.
10        **DEPUTY COMMISSIONER HARMON:** Okay, thank you.
11    We're going to go to the doctor's reports and I'm going
12    to take two of the most recent doctor reports from the
13    institution, and it shows here that Dr. Marek, M-A-R-E-
14    K, a psychologist, completed a report in '06, looks
15    like around September, and the doctor starts out with
16    your, briefly over your history. And that's been
17    covered with the Commissioner, going directly to the
18    area of, under plans if granted release, the doctor
19    writes in part: "if paroled, the prognosis for
20    successful and responsible legal pro-social community
21    adjustment is good". Under current mental status and
22    treatment needs, the doctor writes "he exhibited no
23    depressive or psychotic symptomology. He was calm,
24    cooperative and alert. His mood effect was overall
25    normal. His insight and judgment were good." Under
26    current diagnostic impressions, under access one,
27    polysubstance dependence, "in full remission in a

1   controlled setting". Access two, "anti-social
2   personality disorder by history. Access (inaudible) a
3   GAF of 80. The prognosis for him maintaining his
4   current mental status is good." In review of the life
5   crime, the facts of the incident offense are not in
6   dispute. He has consistently expressed his remorse and
7   regret about his crimes and the harm he has caused. In
8   the heading of assessment of dangerousness, "within a
9   controlled setting his violence potential is lower than
10  average as he generally been able to stay out of
11  trouble for the past several years. If released to the
12  community, his violence potential is considered to be
13  about the same as the average citizen. His criminal
14  past must be taken into account, however, as must his
15  past testing noting that he twice scored in the
16  moderate range of severity in terms of violence
17  potential. His last evaluator said that these testing
18  results would likely never change due to the
19  instruments attention to past criminal factors. This
20  is useful information, but never allows the inmate to
21  'move beyond a score' allowing him to demonstrate
22  improved maturity, judgment and insight. This
23  evaluator cannot predict future free will and behavior,
24  but Mejia is doing all he reasonably can to convince
25  the Board that he is a changed individual. Significant
26  risk factors (inaudible) for violence include a return
27  to drug and alcohol use and a return to an

26

1    irresponsible criminal lifestyle." Under clinical
2    observations, comments and recommendations: "he
3    currently participates in Triple CMS and receives the
4    benefits of being seen once every three months to help
5    him remain 'on the straight and narrow'. It is
6    recommended that he receive the same level of treatment
7    while on parole." That was part of Dr. Marek's report,
8    the prior report is from Dr. Livingston, common
9    spelling for the transcriber on that particular report.
10   The doctor starts out with identifying information and
11   history, and I'm going to go directly to the area of,
12   it's a much more extensive report so I'm just going to
13   take parts of that again, and you're more than welcome
14   to add to it when I'm done. In the early clinical
15   assessment at the time here, and this was in August of
16   '03 so it's a fairly current report, it says under
17   current mental status and treatment needs, he was
18   generally cooperative during the interview and
19   maintained eye contact throughout. He was oriented on
20   all spheres. During the interview process, there were
21   no indications of active thought or mood disorder. In
22   regards to the Board's request to evaluate subject for
23   "the needs for further therapy programs while
24   incarcerated", it is certainly appropriate that the
25   subject continue to involvement himself is substance
26   abuse groups, self-help groups, as well as treatment
27   groups. In the heading of criminal history, the doctor

1   writes, again in part:  in regard to the BPT's request
2   that this examiner discuss "the extent to which the
3   prisoner has explored the commitment offense and come
4   to terms with the underlying causes" the following
5   comments are offered: the subject appears to be aware
6   of the devastation that his behavior has brought into
7   people's lives. However, it's not clear as to whether
8   he understands the wide swath that his destructive
9   behavior cut.  As painful as it may be for Mr. Mejia,
10  it seems to this examiner that while he is receiving
11  mental health services, it will be helpful for him to
12  give concentrated attention to this "wide swath".
13  Furthermore, this examiner experiences some incredulity
14  regarding subject's accounts of the deaths of his two
15  shooting victims, i.e. that both were accidental.  The
16  anticipated explanation would be that subject was
17  drinking, arguing with his wife, grabbed his gun and
18  shot her.  But the incident offense, the expected
19  description would be that he had been drinking, had a
20  gun, was being chased and/or challenged by the victim
21  and shot him.  The subject could do some exploration of
22  these issues in his groups and therapy.  Under the
23  heading of risk for future violence, it should be noted
24  that these measures are identical to those used in the
25  previous report (Rueschenberg June 20 of '02) and
26  consequently would not be expected to change in such a
27  short period of time due to the stapled nature of

28

1   instruments as well as mentioned above, the higher
2   inter-relater reliability.  Nevertheless, this examiner
3   rescored these instruments with all the results that
4   all outcomes were in agreement from all instruments
5   indicating a moderate level of risk for future violence
6   by the subject in the free community.  At the beginning
7   of the interview for the current report, Mr. Mejia
8   asked this examiner by Dr. Rueschenberg's report of a
9   moderate level of risk differed from previous
10  psychological evaluations, which indicated a low level
11  of risk.  The answer given to Mr. Mejia was speculative
12  but suggested that previous evaluations were based
13  primarily on more current programming, giving less
14  emphasis to past events of behavior.  The instruments
15  being uses as indicated above used both static and
16  dynamic factors.  Consequently, the results will always
17  be affected by historical events.  As indicated in the
18  previous section, subject's past behavior is not
19  insignificant regardless of changes he has made and
20  should not be forgotten which evaluating his future,
21  his risk for future violence.  And that was from Dr.
22  Livingston.  And then as the Commissioner indicated
23  earlier, we see the report this morning from a Dr.
24  Macomber, M-A-C-O-M-B-E-R, a psychologist, and I guess
25  this was done privately and we will be reviewing the
26  report during deliberation.  So with that, I've taken
27  parts of the two most recent doctor's reports, parts of

29

1   your counselor's reports and parts of the entire

2   institutional adjustment. I may have inadvertently

3   left out areas that are important to you and your

4   counselor. I'm going to return to the chair because we

5   are going to go into questioning and parole plans, but

6   before we do, is there anything that you wish to add to

7   the areas that I covered today?

8        INMATE MEJIA:  No.

9        DEPUTY COMMISSIONER HARMON:  We've covered these

10  okay?

11       INMATE MEJIA:  Yes.

12       DEPUTY COMMISSIONER HARMON:  Counselor?

13       ATTORNEY HURST:  Yes, except for (inaudible).

14       DEPUTY COMMISSIONER HARMON:  Okay, thank you.

15  I'll return to the chair.

16       PRESIDING COMMISSIONER HARRIS-RITTER:  Thank

17  you.  At time this, Mr. Mejia, we'll talk about your

18  parole plans. First of all, I didn't have a chance to

19  review the note from your friend's wife which is dated

20  August 20, 2006.  It's very recent, indicating that her

21  husband had not answered your letters because he was in

22  the hospital since June with an infection in his heart

23  and he had to have very significant surgery to replace

24  a valve, and he is still recuperating.  And also

25  there's a letter in your file dated August 10, 2006,

26  and it's from Charles Cendejas, is that correct?

27       INMATE MEJIA:  Yes.

30

1        **PRESIDING COMMISSIONER HARRIS-RITTER:** C-E-N-D-

2    E-J-A-S, and that indicates that he has been a friend

3    of yours since you were two years old, or since he was

4    two years old, a long time ago for both of you.

5        **INMATE MEJIA:** A long time.

6        **PRESIDING COMMISSIONER HARRIS-RITTER:** And he

7    indicates that he will do everything he can to help you

8    get a job, a place to stay, and even pick you up at the

9    prison if you were to be released. And he wants to

10   basically help you in any way he can. He lives in

11   Chino Hills (phonetic) in Southern California. Is that

12   correct?

13       **INMATE MEJIA:** Yes.

14       **PRESIDING COMMISSIONER HARRIS-RITTER:** All

15   right. And then the other information that I have in

16   the file related to parole says that you have contacted

17   several organizations, applied for assistance with

18   housing and employment. Is that true?

19       **INMATE MEJIA:** Yes, I have.

20       **PRESIDING COMMISSIONER HARRIS-RITTER:** All

21   right. And this indicates that, why don't you tell me

22   what those organizations are. I have here Salvation

23   Army, Harbor Lights Center, Friends Outside in Los

24   Angeles County, Los Angeles Mission and Christian

25   Residential Rehabilitation.

26       **INMATE MEJIA:** Yes, I'm talking to them.

27       **PRESIDING COMMISSIONER HARRIS-RITTER:** Okay. And

1  the housing authority in Los Angeles County. And have

2  you had any responses from any of these?

3        **INMATE MEJIA:** Yes, I have.

4        **PRESIDING COMMISSIONER HARRIS-RITTER:** And what

5  have you found out?

6        **INMATE MEJIA:** Well, they send me their

7  information packets and how I can contact them when I

8  get out and apply for some of their programs. Now

9  Friends Outside and Salvation Army will not guarantee

10  me housing until I get out. I have to get out in order

11  for them to help me. And Friends Outside said they

12  will take me up in (inaudible) I'm at. I've got a

13  number in there to call them.

14        **PRESIDING COMMISSIONER HARRIS-RITTER:** All

15  right, then I'll move down here. As far as employment,

16  you have outlined potential job opportunities, is that

17  correct? Would you like to tell us about that?

18        **INMATE MEJIA:** I've found one, I don't know if

19  it's in my central file, my handwritten outline of

20  potential job openings for the City of Los Angeles and

21  Cal Trans and I correlated these jobs with my skills

22  that I've learned in prison. And I referenced them in

23  my chronos in my C file. I don't know if you have

24  this.

25        **PRESIDING COMMISSIONER HARRIS-RITTER:** I don't

26  have it in my Board packet.

27        **INMATE MEJIA:** Let me see if I

1      TAPE CUTS OUT HERE

2           **PRESIDING COMMISSIONER HARRIS-RITTER:**  And this

3      is a list of possible employment opportunities.  First

4      you have Friends Outside, and you indicate that they

5      have a list of employers who hire ex-felons in the Los

6      Angeles area.  You indicate second, you said you

7      reviewed the Cal Trans booklet, it provides step-by-

8      step instructions on testing and hiring processes for

9      Cal Trans or any state department and Los Angeles

10     County Department of Human Resources Employment

11     Information Services office, noting that they have

12     openings and tentative examinations. You have the

13     booklet which provides a list of positions available to

14     qualified persons, and then you list specifically that

15     you can apply for data conversion equipment operator,

16     deputy municipal court clerk, which is non-civil

17     service, family support officer. intermediate clerk

18     light typing, intermediate typist clerk, systems aid

19     and transcriber typist, and note they also have

20     positions for general maintenance worker and you also

21     would qualify for the intermediate sewing worker and

22     then you are also qualified to work as a, is it

23     recreation therapy aid?

24           **INMATE MEJIA:**  Yes.

25           **PRESIDING COMMISSIONER HARRIS-RITTER:**  And also

26     you indicate the employment development department sent

27     you their fact sheet providing you information about

1    their job services and programs and recommend that you
2    go to the nearest EDD office to register for employment
3    services.  And then you indicate under employment
4    prospects include a list existing of 262 employers in
5    the sewing industry manufactures of work shoes, safety
6    shoes, things like that and that a majority of them are
7    located in Los Angeles County area.  And with your
8    sewing machine mechanic experience you are qualified to
9    repair (inaudible) and sewing machines, and then your
10   PIA worker application is attached to that.  We'll just
11   take this for us to look at during deliberations and
12   then I'll return it to you after the recess.  All
13   right?

14           **INMATE MEJIA:**  Okay.

15           **PRESIDING COMMISSIONER HARRIS-RITTER:**  Is there
16   anything else you'd like to add regarding parole plans?

17           **INMATE MEJIA:**  Well, my friend offered to give
18   me housing, I thought I had to parole the Los Angeles
19   County but I found out recently that I don't have to
20   necessarily go to Los Angeles County, I can parole to -
21   I don't know what Chino Hills County is, but my friend
22   lives there, in Chino Hills, and he is also foreman for
23   Southern California Gas Company and he told me that he
24   can help get me a job as a welder since I know how to
25   weld.

26           **PRESIDING COMMISSIONER HARRIS-RITTER:**  That's
27   Mr. McLean (phonetic), right?

1      **INMATE MEJIA:**  No, my friend Charles Cendejas.

2      **DEPUTY COMMISSIONER HARMON:**  Cendejas.

3      **PRESIDING COMMISSIONER HARRIS-RITTER:**  Cendejas,

4    okay.  Now Mr. McLean, in the letters that are on

5    record, he's also offering employment, although he's

6    retired from his business he still has associations

7    with different construction companies and he's

8    (inaudible) like that and I worked for Mr. McLain at

9    one time, my Dad retired from his company.  So Mr.

10   McLean knows me as a young boy, a teenage boy also.

11     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay.

12   What about.

13     **DEPUTY COMMISSIONER HARMON:**  Excuse me.

14     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Bless

15   you.

16     **DEPUTY COMMISSIONER HARMON:**  Thank you.

17     **PRESIDING COMMISSIONER HARRIS-RITTER:**  What

18   about dealing with substance abuse?

19     **INMATE MEJIA:**  I have a directory here with all

20   the AA locations in California.  And that's not an

21   updated version, but it can't change that much, you

22   know.

23     **PRESIDING COMMISSIONER HARRIS-RITTER:**  Right.

24     **INMATE MEJIA:**  So, I'm, as far as substance

25   abuse programs when I get out, I definitely intend to

26   attend AA and I'm not going to stop attending AA

27   because I recognize that it's part of my life and for

1   me to succeed on parole, which I want to succeed on

2   parole, I want to continue participating in the AA.

3       **PRESIDING COMMISSIONER HARRIS-RITTER:**  Okay, and

4   how long do you think you need to continue AA?

5       **INMATE MEJIA:**  Well, for the rest of my life.

6   It's not a matter of how long, it's the rest of my

7   life.

8       **PRESIDING COMMISSIONER HARRIS-RITTER:**  All

9   right, thank you.  Now we'll leave parole plans there

10   and we'll move on to the next part of the hearing.  At

11   this time, we're going to note that we have sent out

12   Penal Code Section 3042 notices, those are the notices

13   that go to agencies that have a direct interest in your

14   case.  And in response to those notices, we have a

15   representative from the Los Angeles County District

16   Attorney's office here, and we also have a letter from

17   the County of Los Angeles Sheriff's Department

18   headquarters.  That letter is dated August 25, 2006,

19   and I note that the letter indicates that that (sic)

20   department believes that parole at this time for you

21   would be inappropriate and should be denied.  It's

22   signed by Leroy Baca, B-A-C-A, Sheriff, and Raymond H.

23   Peavy, P-E-A-V-Y, Captain, Homicide Bureau.  I should

24   say it's from Leroy Baca and signed by Raymond Peavy.

25   So at this time, we'll move into the questions portion

26   of the hearing and Commissioner Harmon, do you have any

27   questions you would like to ask?

36

1    **DEPUTY COMMISSIONER HARMON:**  Yeah, I have a

2    couple.  Just so I make sure I understand your position

3    on this, I'm still looking at some of your old

4    supervisor reports, and I notice that you received

5    unsatisfactory grades in interest in assigned work,

6    effort displayed in assigned work, quantity of work,

7    quality of work, teamwork and participation, I'm in

8    November (inaudible) from Senior Library-man Ilenemann

9    I-L-E-N-E-M-A-N-N.  I'm just kind of - -

10    **INMATE MEJIA:**  I've never worked in a library.

11    **DEPUTY COMMISSIONER HARMON:**  You haven't?

12    **INMATE MEJIA:**  No.

13    **DEPUTY COMMISSIONER HARMON:**  Then we're going to

14    have to change that, aren't we?  Huh.

15    **INMATE MEJIA:**  I've never worked in a library.

16    **DEPUTY COMMISSIONER HARMON:**  Okay.  It's in the

17    file, hmmm.  Okay, I'll check it further.  As far as

18    the, I'm having a little trouble also going over your

19    history here.  You're responsible in one way or another

20    for the deaths of four human beings, is that correct?

21    **INMATE MEJIA:**  Yes.

22    **DEPUTY COMMISSIONER HARMON:**  Can I have the,

23    what are the full names of the victims in the car

24    accident?

25    **INMATE MEJIA:**  Valencia (sic) Lopez and

26    Marguerita Silva.

27    **DEPUTY COMMISSIONER HARMON:**  And the man that

1    you shot and killed, do you remember his wife's name?

2    I know, restitution, but do  you remember her name?

3            **INMATE MEJIA:**  Regina Biddle.

4            **DEPUTY COMMISSIONER HARMON:**  And do you remember

5    the children?

6            **INMATE MEJIA:**  I didn't know their children.

7            **DEPUTY COMMISSIONER HARMON:**  Why didn't you know

8    about the children?  It's all part of the crime.

9            **INMATE MEJIA:**  Well I didn't know he had

10   children until I read the probation report.  I only met

11   this guy two or three times, I didn't know anything

12   about his family.

13           **DEPUTY COMMISSIONER HARMON:**  Well, how about the

14   two women that you just described.  Did you know their

15   families?

16           **INMATE MEJIA:**  No, I didn't know their families.

17           **DEPUTY COMMISSIONER HARMON:**  Did you ever learn

18   about their families?

19           **INMATE MEJIA:**  Yes, I did.

20           **DEPUTY COMMISSIONER HARMON:**  What did you find

21   out?

22           **INMATE MEJIA:**  I found out that it was a mother

23   and a daughter in a vehicle with their kids.

24           **DEPUTY COMMISSIONER HARMON:**  You remember how

25   old the Biddle's children were at the time of the

26   Biddle death?

27           **INMATE MEJIA:**  I think they were two and three.

1   **DEPUTY COMMISSIONER HARMON:** You're not sure?

2   I'm just kind of curious how they are doing today. And

3   what about, you know, as I go through your history,

4   you're history is so aplete (phonetic) with violence

5   that I'm curious, how many people have you pointed a

6   gun at that didn't die?

7   **INMATE MEJIA:** It wasn't like I pointed guns at

8   people constantly.

9   **DEPUTY COMMISSIONER HARMON:** Well, even some of

10  the time. How many different people have you at least

11  pointed a gun at and threatened them in one way or

12  another?

13  **INMATE MEJIA:** I haven't used a gun in

14  threatening people.

15  **DEPUTY COMMISSIONER HARMON:** Then how many times

16  have you shot other people that didn't die?

17  **INMATE MEJIA:** I haven't shot anybody really,

18  that didn't die.

19  **DEPUTY COMMISSIONER HARMON:** Even sitting across

20  the table reading your body language, you appear to me

21  that you are upset with my questioning or you are upset

22  with me.

23  **INMATE MEJIA:** No, I'm not upset with you,

24  Commissioner. I'm answering you.

25  **DEPUTY COMMISSIONER HARMON:** Well, it's the body

26  language. You normally respond to questions like this

27  you don't like, or what?

39

1    **INMATE MEJIA:**  No, I'm responding to you.

2    **DEPUTY COMMISSIONER HARMON:**  Okay.  I think I'll

3    return to the chair.

4    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

5    you.  We'll ask the representative from the District

6    Attorney's office of Los Angeles County, Mr. Sequeira,

7    do you have any questions that you'll address to the

8    Panel to have the inmate answer?

9    **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  I have a

10   couple of questions.  The inmate has a support letter

11   from a friend named Cendejas, who apparently has known

12   the inmate since he was two years old.  Would it be

13   correct to say that Mr. Cendejas grew up in the same

14   neighborhood with the inmate?

15   **PRESIDING COMMISSIONER HARRIS-RITTER:**  Answer to

16   the Panel.

17   **INMATE MEJIA:**  Yes.

18   **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Was he also

19   a member of the flats gang?

20   **INMATE MEJIA:**  No, he wasn't.

21   **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Has Mr.

22   Cendejas done any time in prison or jail?

23   **INMATE MEJIA:**  No, he hasn't.

24   **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Not in his

25   entire life?

26   **INMATE MEJIA:**  No, he hasn't.

27   **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  With respect

1   to the killing of the inmate's common-law wife, can the

2   Panel asked the inmate to explain exactly what happened

3   with respect to her death?

4          **PRESIDING COMMISSIONER HARRIS-RITTER:**  Go ahead.

5          **INMATE MEJIA:**  Okay, I was intoxicated on

6   alcohol and marijuana and I was playing around with the

7   gun, a 25 automatic.  I was re-loading and unloading it

8   several times and in the process of doing this, it

9   discharged and I shot her.

10         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Where was

11  she shot?

12         **INMATE MEJIA:**  In the head.

13         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  How close

14  was the inmate to the common-law wife when she was shot

15  in the head?

16         **INMATE MEJIA:**  I'd say about as far as the

17  Commissioners are sitting away from me.

18         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  About three

19  feet or four feet, or something like that.

20         **INMATE MEJIA:**  No, about, I would say about this

21  distance.

22         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Across the

23  table.

24         **INMATE MEJIA:**  Yeah.

25         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Now at the

26  time this happened, the inmate was a convicted felon

27  and he wasn't even supposed to be owning a firearm, is

41

1    that correct?

2          **INMATE MEJIA:** Yeah, I was a convicted felon.

3          **DEPUTY DISTRICT ATTORNEY SEQUEIRA:** What was the

4    inmate doing with a weapon, any weapon?

5          **INMATE MEJIA:** Well, at that time I was living

6    that irresponsible life. I didn't obey the law.

7          **DEPUTY DISTRICT ATTORNEY SEQUEIRA:** So this

8    particular killing was an accident, is that correct?

9          **INMATE MEJIA:** Yes.

10         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:** Was the

11   killing of the victims, Elisa Lopez and Marguerita

12   Silva also an accident?

13         **INMATE MEJIA:** I got in the vehicle. Had I

14   known I was going to kill them people while being

15   intoxicated, I wouldn't have gotten into the vehicle.

16   But, driving the vehicle resulted in their deaths, now

17   I'm responsible for their deaths.

18         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:** The question

19   isn't whether you were responsible, was it an accident?

20         **INMATE MEJIA:** No.

21         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:** Why?

22         **INMATE MEJIA:** Because I was under influences of

23   alcohol and I should have known better. I know better

24   now, but then I didn't know better and it still don't

25   excuse me.

26         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:** What other

27   victims were affected in the collision with the car in

42

1   which Ms. Lopez and Ms. Silva were riding in?

2       **INMATE MEJIA:**  The two kids that were in there.

3       **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  What kind of

4   injuries did they sustain?

5       **INMATE MEJIA:**  Fortunately, they weren't injured

6   seriously.  I think one of them had a leg injury and

7   the other one had a injury to the mouth, and a

8   concussion, if I recall right.

9       **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Looking at

10   the Probation Report and it says here, on page ten,

11   Maria Lopez received emergency medical treatment for a

12   possible concussion, she's age 15, Mr. Lopez's 13 year

13   old daughter, Anna Maria Juarez, was hospitalized in

14   the intensive care unit with fractured teeth and

15   possible skull injuries.  Are those the minor injuries

16   the inmate is talking about?

17       **INMATE MEJIA:**  I didn't see that part of the

18   report.

19       **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Now, the

20   killing of Mr. Biddle was that an accident?

21       **INMATE MEJIA:**  I went with the intent to rob a

22   drug dealer, I didn't intend to kill Mr. Biddle, but

23   because of my actions of firing the gun at him, I

24   killed him.

25       **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Yeah, when

26   you fired the gun at him, you intended to kill him.

27       **INMATE MEJIA:**  No, I wasn't.  I thought I'd

43

1    fired over his head and I really didn't know if I shot

2    him because he kept running and I found out that he

3    died the next day, when I heard.

4         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  So it would

5    be an accident that the bullet actually hit Mr. Biddle,

6    then.

7         **INMATE MEJIA:**  I'm not saying it's an accident

8    that the bullet hit him, I fired at him and as a result

9    of me firing at him, one of the bullets struck him in

10   the back of the shoulder and resulted in me killing

11   him.

12        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  But if you

13   weren't trying to shoot him, why did you fire at him?

14        **INMATE MEJIA:**  Because I was trying to get them

15   to let us go.  I thought I could scare them.

16        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Your last

17   parole hearing, you described all of these deaths and

18   killings as being accidents.  Isn't that correct?

19        **INMATE MEJIA:**  No, I didn't.

20        **ATTORNEY HURST:**  (Inaudible.)

21        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Now, with

22   respect to after these incidents occurred, there was

23   also an arrest where you were sitting in a restaurant

24   and you pulled out a gun and laid it on the table.  Is

25   that correct?

26        **INMATE MEJIA:**  Yes.

27        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  And now

44

1   again, at this time, you were a convicted felon and you

2   weren't supposed to be in possession of a handgun.  Did

3   the inmate know that?

4         **INMATE MEJIA:**  Yes.

5         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  What was the

6   inmate doing with a weapon?

7         **INMATE MEJIA:**  As, after I found out I killed

8   Thomas Biddle, I thought that there would be

9   retaliation against me for killing him, so I had a

10  weapon.

11        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Who would

12  want to retaliate against the inmate?

13        **INMATE MEJIA:**  Well, the drug dealer and their

14  friends.  Biddle's friends.

15        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  You knew all

16  of these people?

17        **INMATE MEJIA:**  Well, now I knew that these

18  people were associated with the drug dealer so-called

19  protection and looked out for the drug dealer.  I knew

20  that they would find out that I did this and they would

21  possibly want to retaliate against me.

22        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  I have no

23  further questions, thank you.

24        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

25  you.  Ms. Hurst?

26        **ATTORNEY HURST:**  I just have a couple questions.

27  Mr. Mejia, you caused a lot of harm to a lot of people.

45

1    Is that correct?

2         **INMATE MEJIA:**  Yes.

3         **ATTORNEY HURST:**  You consistently broke the law

4    at that time in your life.  Is that also correct?

5         **INMATE MEJIA:**  Yes.

6         **ATTORNEY HURST:**  You won't argue with

7    (inaudible) today?

8         **INMATE MEJIA:**  No.  Why would I want to argue

9    with it?

10        **ATTORNEY HURST:**  That's all I have.

11        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

12   you.  Then we'll move to closing statements.

13        **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**  Thank you.

14   I would ask the Panel to find the inmate unsuitable for

15   parole.  This inmate has demonstrated a history of

16   violence and criminal behavior starting at a very early

17   age, as a juvenile even.  There are numerous offenses.

18   First of all as a juvenile, vehicle theft, in which you

19   were sent to the Youth Authority.  A robbery arrest and

20   you were re-committed back to the youth authority in

21   '67.  There was an arrest for an assault with an intent

22   to commit murder, he was returned to CYA as a parole

23   violator and the charges were dismissed.  Burglary as a

24   felony, that was his first felony conviction in 1971,

25   which I believe makes him about 18 or 19 at the time.

26   He was on probation for that offense.  Then there was

27   the multiple drunk driving convictions and arrests in

46

1   '72, three in '73, one in 74.  Then in 1974, he kills

2   his common law wife by shooting her in the head and the

3   inmate claims it was an accident, but it's difficult to

4   believe that it was a mere accident. I have the same

5   problem with the inmate's description of that crime as

6   being an accident.  Nevertheless, he was convicted of

7   manslaughter and was sentenced to prison.  Then there

8   was an additional commitment and his probation was

9   revoked for attempted burglary, and he was given six-

10  months to ten-year concurrent term with the

11  manslaughter.  Paroled in L.A. in '77.  Discharged from

12  parole in '78.  '77, another burglary as a misdemeanor,

13  another (inaudible) in '77, and another driving under

14  the influence of narcotics in '78, clearly indicating

15  that the inmate had a drug problem, he had an unstable

16  social history with respect to his gang involvement in

17  the flats gang.  Most of his schooling has been done in

18  either the youth authority or in prison.  Drug abuse,

19  using heroin, barbiturates and methamphetamines.  Then

20  of course, moving forward to the murder of Mr. Biddle,

21  also a crime in which the reason for the killing was a

22  completely trivial.  The inmate admitted that he was

23  there to rob a drug dealer, an armed robbery, from a

24  dope dealer that was somehow thwarted and as they were

25  leaving, some people came towards him, the inmate

26  pulled out a weapon, the victim ran, and the inmate

27  fired and killed Mr. Biddle. He tries to minimize it by

47

1    saying that all of these people were armed, they were
2    coming after him, I don't find that to be credible in
3    the least.  And the fact that Mr. Biddle was shot in
4    the back and not in a different area, as the inmate has
5    previously indicated, shows that the victim was in fact
6    fleeing when he was killed and there was absolutely no
7    reason to kill him.  This murder case was under
8    investigation when it was discovered that the inmate
9    was in prison, or actually was in jail on a pending
10   charges of a vehicle manslaughter involving parole
11   victims, the two that were killed, Ms. Lopez and Ms.
12   Silva, and their children who were injured quite
13   severely in the collision.  This man is a complete
14   danger to society.  He is and has been the reason for
15   four people's deaths and countless other people's
16   injuries.  At least two we know of, and of course, the
17   effect on his own children who were deprived of their
18   mother by his killing his common-law wife.  He came to
19   prison and continued to use alcohol and received a few
20   disciplinaries in prison, so his programming has been
21   good recently but initially it was very poor.  I don't
22   find that he has any real parole plans. He has someone
23   who offers a place to live, but there is no job offers
24   with respect to any solid parole plans. The psychiatric
25   evaluations are (inaudible) despite Mr. Macomber's
26   privately retained opinions, which I find to be
27   inherently unreliable based upon the fact that he

1    doesn't even use the same tests with respect to
2    violence risk assessment that two previous
3    psychologists have used to (inaudible) in fact,
4    presents a moderate risk to society and I think it's
5    very, I think the stigma from Dr. Livingston, the last
6    sentence of his report, is extremely important.  It
7    says as indicated in the previous section, the inmate's
8    past behavior is not insignificant regardless of the
9    changes he has made and should not be forgotten when
10   evaluating the risk of future violence.  If there's one
11   thing that the psychiatrists are clear on, it's the
12   best predictor of future behavior is past behavior.  And
13   in this case, the inmate's past behavior has indicated
14   a very violent background, yet Mr. Macomber, of course
15   who is privately retained, appears to ignore all that.
16   He ignores any past behavior and he talks about these
17   facts where (inaudible) you can't use them as risk
18   assessments for someone over 40 years of age, which is
19   completely contrary to the other psychiatrists and the
20   violence risk assessments that were deduced by the
21   analysis by Dr. Berning (phonetic) and Rueschenberg and
22   Livingston.  Nevertheless, this inmate needs a
23   significant amount of more time in prison to further
24   cope with what he has done and to make sure that his
25   addiction, addictive problems are completely settled.
26   And for those reasons, I would ask the Panel to find
27   the inmate unsuitable for parole and to make it a

49

1    multiple year denial.

2         **PRESIDING COMMISSIONER HARRIS-RITTER:**   Thank

3    you.  Ms. Hurst?

4         **DEPUTY DISTRICT ATTORNEY SEQUEIRA:**   Thank you.

5    Now Mr. Mejia has an absolutely horrible history and

6    he's certainly (inaudible) to mitigate any of that.  He

7    was responsible for four deaths.  One of those was

8    downgraded to involuntary manslaughter.  One of those

9    was a murder and that is the life crime.  And no matter

10   how many questions Mr. Mejia was asked today about the

11   other deaths, he clearly is not willing to consider

12   them accidents.  He knows they are not accidents. They

13   are a result of his lifestyle, and the life crime that

14   brought him to prison on this term, occurred just about

15   exactly half a lifetime ago for him, a 27 year old

16   crime.  There is really no place for him to go but up,

17   if he was going to survive at all.  And he's made some

18   tremendous changes.  He's not the same person that he

19   was.  I'm not asking you to forget any part of his past

20   history. Nobody would ever expect that.  But it's only

21   a part of who he is today.  Clearly he's given a lot of

22   thought to these crimes, a lot of thought to – he

23   understands the details and he understands the

24   magnitude of the offenses.  And he is certainly not the

25   same person he was.  And, you say, Mr. Sequeira says

26   that his recent history and recent programming was

27   good.  His programming is excellent, for at least the

1   past twenty years. He hasn't had a 115 since 1986, he's
2   upgraded educationally, he's taken courses from Patton
3   College, Chapman College, he has taken classes in
4   becoming involved with the Coastline program, he has
5   upgraded vocationally.  He has completed mechanical
6   drafting and data processing, sewing machine operator,
7   and he is also a welder, he was a welder (inaudible).
8   Self-help has been, he has been in the programs
9   (inaudible) he has no opportunity or any way to get
10  them no.  He has had the (inaudible) program, the 18
11  month (inaudible) program, the various things that were
12  associated with (inaudible) rational behavior training,
13  relaxation therapy, (inaudible) that you are probably
14  familiar with.  In addition to that, he's had
15  additional anger management classes, he's been involved
16  in the alternatives to violence programs at all three
17  levels, he has currently evolved by being a facilitator
18  and he has been a facilitator.  The psyche reports are,
19  I think the psyche reports, Dr. Macomber's report
20  should have been given a little bit more attention than
21  it was, it's certainly allowed to submit documents for
22  your consideration during this hearing, but I will
23  respect (inaudible).  And then Dr. Marek's report was
24  prepared for this hearing by the institution, by the
25  department. It was positive report, and I think was
26  thoroughly supportive of release.  Under the assessment
27  of dangerousness, Dr. Marek also discusses the use of

1    the tests that were given in the past and he said that
2    the last evaluator and I believe that was probably Dr.
3    Livingston, the last evaluator said that the
4    information would never allow the inmate to move beyond
5    his score, allowing him to demonstrate improved
6    maturity, judgment and insight. And this evaluator
7    cannot predict his future role in behavior, but he has
8    done all he reasonably can to convince the Board he's a
9    changed individual. Significant risk factors and
10   precursors to violence include a return to drug and
11   alcohol use and a return to his irresponsible life
12   style. The report has caused him trouble, I think for
13   him, is Dr. Livingston's report which was done in 2003
14   and Dr. Livingston (inaudible) supports the use of the
15   BPCLR and the (inaudible) psychopathic checklist, and
16   he says, and I think (inaudible) that there must be,
17   the results are always going to be affected by his
18   score (inaudible) historical events. Those things
19   can't be ignored. Such past (inaudible) is not
20   insignificant. Of course it's not. Of course, it's
21   not. We understand that. Dr. Macomber has gone
22   through a number of different reports that have been
23   prepared over the years and one in 1996 by Dr. Eric
24   Rueschenberg says at that time that Mr. Mejia's level
25   of dangerousness was seen as below average. 1999, Dr.
26   Berning said he has positive programming and noted
27   violence potential was seen as below average.  2002,

1   same doctor, Dr. Rueschenberg administered the three

2   test (inaudible) and he scored in the moderate range.

3   And again, it's pointed out that those are based

4   largely on static factors. Dr. Livingston's report has

5   been discussed by you and Dr. Marek's report as well.

6   Now Dr. Macomber is not the only doctor who has raised

7   the issue as to whether the particular tests that were

8   used are appropriate for a life (inaudible) or for a

9   population that is over a certain age. So I think

10  that's clearly an issue, but Dr. Macomber did

11  administer and it's going to take me awhile to find

12  this, he did administer several other tests, which were

13  more favorable for Mr. Mejia and the first one, let's

14  see, MCMIT and that was an inventory that was designed

15  to identify access one and access two psychiatric

16  disorders. And on that particular test, Mr. Mejia's

17  anti-social score was very low, indicating he is no

18  more anti-social than the average citizen at this time

19  in his life. The second test that he administered was

20  the psychological inventory of criminal thinking styles

21  by Dr. Glen Walters. There were several elements of

22  that (inaudible) the conclusion that he drew was that

23  Mr. Mejia's scores were all in the normal range

24  indicating he doesn't have any criminal thinking styles

25  at this point. The LSIR, the level of service

26  inventory, is basically inside CDC as well, and the

27  result of that test was that the actual measure

53

1    predicted Mr. Mejia will make a good adjustment in
2    society.  The fourth test was the substance abuse
3    subtle screening inventory. I have never heard of that
4    one, and he discusses that in some detail, indicating
5    Mr. Mejia was not defensive, was not guarded in his
6    responses, understands he has a drug problem, and the
7    conclusion he drew was that Mr. Mejia has a low
8    probability of having a substance dependence disorder.
9    The final test was the inventory of offender's list
10   needs and strengths.  And again, there is some
11   discussion of that, the conclusion is he will not pose
12   a risk factor in the community. Those are just as valid
13   testing tools as the ones that were used by CDC and I
14   would certainly ask you to give them some consideration
15   as well.  Now there is one other issue relative psyche
16   and psyche issues, and there was some discussion that
17   occurred during the course of the hearing about
18   attitude problems that were actually observed in 1990,
19   1991 and appear to have resurfaced again in the last
20   couple of years.  And that would be related to the mood
21   swings and/or depression.  I think that really what we
22   are looking at here is two different things.  We're
23   looking at initially an underlying disorder, something
24   he had when he came into prison, an anti-social
25   personality disorder, which has been resolved.  And
26   then last year when he was in treatment with
27   interferon, we learned this from experience with many

1  other inmates that the drug itself does tend to cause

2  mood swings and depression, and that's a different

3  thing. That is not an unresolved personality disorder,

4  but rather something that existed as a result of his

5  medication. He sought help for that, he got involved

6  in Triple CMS programs, he's on medication, and that

7  has worked, so I think it's two different things. His

8  parole plans (inaudible) for seven years, he's made a

9  lot of outside contacts. He has many job skills, he

10 has many opportunities. He has contacted a number of

11 agencies and I think we all know they are not going to

12 make a firm commitment until he gets a release date.

13 He does however, have the letter from Mr. Cendejas and

14 his offering of residence and assistance and possibly a

15 job, so I think he has it as well covered as he can at

16 this time. Now, I know I've taken a little longer than

17 I usually do and it's largely because of these

18 questions about psyche reports, but I think Mr. Mejia

19 deserves a lot of credit for what he's done and I'm

20 just asking you to give weight to everything that

21 you've heard today. Thank you.

22  **PRESIDING COMMISSIONER HARRIS-RITTER:** Thank

23 you. Mr. Mejia, would you like to make a closing

24 statement?

25  **INMATE MEJIA:** Yes.

26  **PRESIDING COMMISSIONER HARRIS-RITTER:** Go ahead.

27  **INMATE MEJIA:** I feel real terrible about the

55

1    lives lost that were spoken of today in this hearing.
2    I can never change my path, I'm truly sorry for all the
3    harm I have caused everyone in my life that has come in
4    contact with me. I was a terrible person back then. I
5    didn't have no morals, I didn't think. I was basically
6    stupid. Because it takes a stupid person to get
7    themselves in this position that I'm in now. I've dug
8    a hole for myself. I realize that, and I stopped
9    hurting people. I'm no longer that person anymore. I
10   do all this time, I've been in, sure I didn't come in
11   and just change like that. I took several, several
12   years after to finally realize that I'm stupid. I'm
13   going to end up continuing the same life and I don't
14   want to. I can't make amends other than to change
15   myself and that's what I did. I seriously stopped and
16   looked at the direction my life was going and looking
17   at all the past harm I've caused, and I don't want to
18   live that no more. I've decided to do something about
19   it. Like it was brought up earlier, I've upgraded
20   myself vocationally and educationally. These are
21   things that you just don't gain overnight. It took me
22   several years to complete the trade I do. So it shows
23   that I can plan long-term goals and stick to them.
24   That's what I've been doing to get out on parole, I've
25   set my goals and I'm out there in employment and
26   (inaudible) AA and living a law-abiding citizen's life.
27   I can do it, I've done this (inaudible). I've been

1    disciplinary free for twenty years.  If I can abide by
2    the rules in here, I can abide by the laws out there.
3    I've got viable skills to seek employment, more than
4    one viable skill.  I've given the Commissioner Ritter a
5    directory of AA meetings and all of California.  I'm
6    serious about going to AA now.  My drug and alcohol in
7    the past, it was a serious issue. It is no longer
8    because if I remain clean and sober while I've been in
9    prison these past twenty years, obviously I've got a
10   handle on it.  And there is no need to think about me
11   continuing that type of lifestyle, because I haven't
12   done it in here and it's accessible in here also, I'm
13   sure you know.  So I no longer got that problem of
14   alcohol or drug use.  And another thing I don't have is
15   that same, you know, criminal mentality I had when I
16   came in where I was involved as a youngster, involved
17   in gang activity and I hated (inaudible) in prison. I
18   found my central file there.  I'm not even associated
19   with any groups in here.  So I'm not living that
20   criminal lifestyle anymore.  Everything I do in my life
21   today is to change myself and not become that person
22   that I was in the past that hurt so many people.  It
23   not only hurts me personally that I disrupted so many
24   lives, I'm ashamed of it.  I'm ashamed of it.  And I
25   just hope that the Board considers all that I've done
26   to the present moment to date.  The person that's in
27   here before you today is not the same person I was.

57

1          **PRESIDING COMMISSIONER HARRIS-RITTER:**    Thank

2    you.

3                    (TAPE STOPS HERE.)

4

5                    **R E C E S S**

6                    --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

58

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER HARMON:  And you're on**

4    record.

5    **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

6    you.  We are back on the record and all parties

7    previously noted as present are still present and the

8    time is 12:05 p.m.  In the matter of inmate Jimmy

9    Mejia, the Panel has reached the following decision.

10   Before I read the decision, I do want to note for the

11   record that we have taken a recorded document in as

12   Exhibit Two.  It's the report dated September 22, 2006.

13   Mr. Mejia, the Panel has reviewed all information

14   received from the public and relied on the following

15   circumstances in concluding that the prisoner is not

16   suitable for parole at this time and would pose an

17   unreasonable risk of danger to society or a threat to

18   public safety if released from prison.  This is a one-

19   year denial.  The offense was carried out in an

20   especially cruel and callous manner.  The offense was

21   carried out in a dispassionate manner and the offense

22   was carried out in a manner which demonstrates an

23   exceptionally callous disregard for human suffering.

24   The motive for the crime was inexplicable and was

25   incredibly trivial relation to the offense.  The murder

26   of the victim did not deter the prisoner from later

27   **JIMMY MEJIA  C-10575    DECISION PAGE 1   10/25/06**

59

1    committing another criminal offense, specifically he

2    was a felon in possession of a handgun. This left

3    (inaudible) later.  These conclusions are drawn from

4    the statement of facts in the Probation Officer's

5    Report from pages six to seven which I'll incorporate

6    by reference, and note Mr. Biddle, the victim, the

7    murder victim in this case was shot in the back as he

8    ran from the inmate 30 or 40 (inaudible).  The prisoner

9    has, on previous occasions, inflicted or attempted to

10   inflict serious injuries on victims.  He has a record

11   of violence for assaultive behavior and an escalading

12   pattern of criminal conduct and violence.  He has a

13   history of unstable tumultuous relationships with

14   others and a gang lifestyle.  He already has failed

15   previous grants of probation and parole and cannot be

16   counted upon to avoid criminality.  He has failed to

17   profit from society's previous attempts to correct his

18   criminality.  Such attempts include juvenile probation,

19   adult probation, county jail, CYA commitments, and

20   parole.  He has an unstable social history and prior

21   criminality, which includes shooting to death his

22   common-law wife, eight drunk driving convictions with

23   two women being killed, multiple robberies, burglaries

24   and significant long-term drug and alcohol abuse.  The

25   prisoner has not sufficiently participated in the

26   benefits of self-help and therapy programs.  He has

27   **JIMMY MEJIA  C-10575    DECISION PAGE 2 10/25/06**

60

1  failed to demonstrate evidence of positive change. His
2  conduct while incarcerated includes two 128a counseling
3  chronos, the last of which was April 24, 2003, an
4  unacceptable attitude, and five serious 115
5  disciplinary reports, the last of which was March 1,
6  1986, for being under the influence of inmate-made
7  alcohol.  The hearing Panel notes that responses to
8  Penal Code Section 3042 notices indicate opposition to
9  a finding of parole suitability, specifically the
10  District Attorney of Los Angeles County and the Los
11  Angeles County Sheriff's Department. Other information
12  bearing upon suitability:  other factors include past
13  mental state, past and present attitude toward the
14  crime, signs of remorse, involvement in other criminal
15  misconduct that is reliably documented, and any other
16  relevant reliable information or circumstances which
17  taken alone may not firmly establish unsuitability, but
18  which when taken together contribute to a pattern which
19  results in unsuitability.  The Panel is aware of
20  (inaudible) agreements from three to twenty years, and
21  programming while making significant effort on parole
22  plans.  But the Panel has concerns regarding insight
23  into your criminal behavior to the point where you are
24  ready for parole.  You have not convinced this Panel
25  that you have the necessary insight into your role in
26  killing four people.  The Panel makes the following
27  **JIMMY MEJIA  C-10575    DECISION PAGE 3    10/25/06**

1    findings. The prisoner needs additional therapy in

2    order to face, discuss, understand and cope with stress

3    in a non-structured manner.  Until further progress is

4    made, the prisoner continues to be unpredictable and a

5    threat to others.  In view of the prisoner's assaultive

6    history and violent background, there is no indication

7    that the prisoner will behave differently if paroled at

8    this time.  Nevertheless, the prisoner should be

9    commended for continuous AA participation, completing

10   the alternative to violence course, being discipline

11   free for over twenty years as previously indicated, for

12   his group studies, for completing outrageous math

13   distance learning course and being a pier educator.

14   However, these positive aspects of his behavior do not

15   outweigh the factors of unsuitability.  The Panel makes

16   the following recommendations.  The Panel recommends

17   that the prisoner remain disciplinary free and if

18   available, participate further in self-help and therapy

19   programs. That concludes the reading of the decision.

20   Mr. Harmon, do you have anything you'd like to add?

21        **DEPUTY COMMISSIONER HARMON:**  I think you've

22   covered it all, I have nothing further to say.

23        **PRESIDING COMMISSIONER HARRIS-RITTER:**  Thank

24   you.  That concludes the hearing.  It's 12:10 p.m.

25              **A D J O U R N M E N T**

26                   --oOo--

27   **JIMMY MEJIA  C-10575   DECISION PAGE 4  10/25/06**

62

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    PAROLE DENIED ONE YEAR

24    THIS DECISION WILL BE FINAL ON: __FEB 2 2 2007__

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED

27    JIMMY MEJIA   C-10575    DECISION PAGE 5   10/25/06

63

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, TENA OLVERA, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 62, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of JIMMY MEJIA, CDC No. C-10575, on OCTOBER 25, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated January 11, 2007 at Sacramento County, California.

Tena Olvera

_____

Tena Olvera
Transcriber
Northern California Court Reporters

# EXHIBIT 4

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 2, 2007 | | | |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

|  | BH 004676 | (Parties and Counsel checked if present) |
|---|---|---|
| ! | In re, | |
| | JIMMY G. MEJIA, | Counsel for Petitioner: |
| | Petitioner, | |
| | On Habeas Corpus | Counsel for Respondent: |

Nature of Proceedings: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on May 7, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on November 16, 1979 after a conviction for murder in the second degree. He was sentenced to 15 years to life. His minimum parole eligibility date was March 17, 1987.

The record reflects that on June 10, 1979, the Petitioner and a friend decided to rob a drug dealer at gunpoint. They armed themselves and went to the drug dealer's apartment. While they were heading toward the drug dealer's apartment, they encountered a man who inquired as to why they were there with guns. Fearing that they would be caught, the Petitioner and his friend left the apartment building. At that point, the victim, Thomas Biddle, and another man chased after the Petitioner and his friend. The Petitioner claims that he stopped and told the victim, "we don't have to hurt each other", but that the victim continued to confront him. The Petitioner saw that the victim was armed and fired several shots in the victim's direction. The victim was able to run away, however, one of the shots hit the victim and he was killed.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on October 25, 2006. The Petitioner was denied parole for one year. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense, his previous record of violence, and his unstable social history.

The Court finds that there is no evidence to support the Board's findings that commitment offense was carried out in a dispassionate and calculated manner, that the offense demonstrated an exceptionally callous disregard for human suffering, or that the Petitioner's motive was very trivial in relation to the offense. Although the Petitioner did plan to rob the drug dealer at gunpoint, his encounter with the armed victim and the resulting murder were not planned. There is no other evidence on the record to suggest that the Petitioner's actions were dispassionate and calculated, as required by Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(B).

1

| Minutes Entered |
|---|
| 10-02-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | OCTOBER 2, 2007 | | | |
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td></td><td></td><td align="center">(Parties and Counsel checked if present)</td></tr>
<tr><td rowspan="2">!</td><td>BH 004676<br><br>In re,<br>JIMMY G. MEJIA,<br>    Petitioner,<br>On Habeas Corpus</td><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td></tr>
</table>

Additionally, the Petitioner's commitment offense did not demonstrate an exceptionally callous disregard for human suffering, as the offense was no more aggravated or violent than is ordinarily shown in the commission of a second-degree murder. See *In re Scott* (2004) 119 Cal.App.4th 871, 891. The Petitioner shot the victim once and did not beat or abuse him in any other way. While this was certainly a terrible crime, it was no more aggravated or violent than most second-degree murders and thus, did not demonstrate an exceptionally callous disregard for the victim's suffering, under Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).

The Court also finds that the Petitioner's motive was not very trivial in relation to the offense under Cal Code Regs. tit. 15, §2402, subd. (c)(1)(E). Certainly, had the Petitioner shot the victim merely to further his original goal of robbing the drug dealer, his motive could be considered very trivial. However, the victim was chasing the Petitioner and appeared to be armed when the Petitioner shot him. While this was not excusable, the motive was not materially less significant than those that conventionally drive people to commit such offenses. See *Scott* at 893.

The Court finds that there is some evidence to support the Board's finding that the Petitioner has a previous record of violence. Cal. Code Regs., tit. 15, §2402, subd. (c)(2). The Petitioner has several serious, violent prior convictions, including robbery; assault with intent to commit murder, which resulted in the death of the Petitioner's common law wife; as well as manslaughter by vehicle, which resulted in the deaths of two women. This shocking criminal history began when the Petitioner was a juvenile, continued throughout his adulthood and demonstrates serious assaultive behavior throughout the Petitioner's life. Further, when the Petitioner was arrested for the commitment offense, he was still carrying a concealed handgun. This demonstrates that he was planning to continue his violent behavior and is some evidence that the Petitioner would be an unreasonable risk of danger to society if released on parole.

Additionally, the Court finds that there is some evidence to support the Board's finding that the Petitioner has an unstable social history. Cal. Code Regs., tit. 15, §2402, subd. (c)(3). The Petitioner admits that he was a gang member since he was a teenager and that he was involved in gang-related activities. Also, the Petitioner shot his common law wife to death. This constitutes some evidence that the Petitioner has a history of tumultuous relationships with others and may, therefore, be unsuitable for parole.

The Board also considered the Petitioner's previous lack of insight into his responsibility for taking four lives, his reported attitude problems with correctional staff, and his limited self-help programming. While these

2

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 2, 2007 | | | | |
|---|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JOSEPH M. PULIDO | | Deputy Clerk |
| | NONE | Bailiff | NONE | | Reporter |

<table>
<tr><td></td><td colspan="2">(Parties and Counsel checked if present)</td></tr>
<tr><td rowspan="5">⸮</td><td>BH 004676</td><td></td></tr>
<tr><td>In re,</td><td></td></tr>
<tr><td>JIMMY G. MEJIA,</td><td>Counsel for Petitioner:</td></tr>
<tr><td style="text-align:center">Petitioner,</td><td></td></tr>
<tr><td>On Habeas Corpus</td><td>Counsel for Respondent:</td></tr>
</table>

factors, alone, may not justify a finding of unsuitability, the Board may properly consider them as relevant to a determination of whether the Petitioner is suitable for parole. Cal. Code Regs., tit. 15, §2402(b).

The Board's decision may be upheld, despite flaws in its findings, if it is clear it would have reached the same decision even absent the errors. See *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100. Here, it is clear that the Board would have denied the Petitioner parole, even absent the aggravating offense factors, based on his previous record of violence, unstable social history, and other factors, all of which weighed against his suitability. The Court finds that together, these factors constitute some evidence that the Petitioner poses an unreasonable risk of danger to society and is, therefore, not suitable for release on parole.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Jimmy G. Mejia
C-10575
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689


State of California - Department of Justice
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

| Minutes Entered |
|---|
| 10-02-07 |
| County Clerk |

# EXHIBIT 5

PSYCHOLOGICAL EVALUATION
FOR THE BOARD OF PAROLE HEARINGS
REVISED SEPTEMBER 2006
PAROLE CONSIDERATION HEARING
OCTOBER 2006 LIFE TERM INMATE CALENDAR



CORRECTIONAL TRAINING FACILITY-SOLEDAD
September 8, 2006

This is a psychological evaluation for the Board of Parole Hearings on inmate Jimmy Mejia, CDC# C-10575. This report is the product of a personal interview as well as a review of his central file and unit health record. This interview was a single contact for the sole purpose of preparing this report.

## I. IDENTIFYING INFORMATION:

Mejia is a 54-year-old, divorced, Hispanic male serving a 15-years-to-life sentence for Murder in the Second Degree, Manslaughter by Vehicle and Possession of a Firearm by an Ex-Felon. He was reared Catholic. He had no unusual physical characteristics, nicknames or aliases.

## II. DEVELOPMENTAL HISTORY:

He had no prenatal or perinatal concerns, birth defects, abnormalities of developmental milestones, history of cruelty to animals, enuresis, arson or a history of physical or sexual abuse, either as a perpetrator or a victim.

## III. EDUCATION:

Due to legal problems, his formal schooling was terminated after completing the tenth grade while attending a continuation school. He later got his high school diploma at the Youth Training School in 1970.

## IV. FAMILY HISTORY:

His father died in 1985 due to a heart attack. His father was a hard worker who never complained and believed that Mejia should do the same. His mother was a housewife and has arthritis. He has not had any contact with his mother since 1989. He has a half-brother and a half-sister. He was never close with his siblings because of their being older as well as having a different father. His grandparents died before he was born. He has been estranged from his family for a number of years.

## V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

He says he is a heterosexual male with no history of high-risk sexual behavior or sexual aggression.

/.

## VI. MARITAL HISTORY:

He married his first wife around age 18 and this relationship lasted about four years. They had two children. This relationship ended when he accidentally shot her to death while loading his gun. He is in contact with his daughter. Mejia's marriage to his second wife lasted five years. They had three children. His third marriage began in 1989 and ended in 1991. He attributed the divorce to his incarceration and her long work hours. He is not in contact with his third wife.

## VII. MILITARY HISTORY:

He never served in the military.

## VIII. EMPLOYMENT/INCOME HISTORY:

Mejia tried to emulate his father's work ethic and was involved in the plumber's union as an apprentice but was also heavily involved in alcohol, drugs and criminal activity. He is, apparently, a member of the plumber and pipe fitters union. He completed vocational data processing training in 1994. He is currently employed as a plumber. He says he has completed welding, drafting and sewing machine repair vocations.

## IX. SUBSTANCE ABUSE HISTORY:

He began abusing alcohol at age 14 and, at the time of the instant offense, had been addicted to heroin for about nine years. He started participating in AA in 1983 and since about 1990, his attendance has been outstanding. He has been attending NA since 2002. He plans to maintain a lifetime commitment to AA/NA.

## X. PSYCHIATRIC AND MEDICAL HISTORY:

He is currently in the CCCMS program primarily to stabilize his mood and improve his sleep. He takes medication and is pleased with the results. He was on interferon for hepatitis C. He has no history of serious accident, head injury, suicidal behavior, significant impairment, seizure or other neurological conditions. He has taken several Personal Growth Seminars and has two Chronos in his file about completing an Alternatives to Violence/Victim Awareness Workshop. He says he has completed three of these workshops: Basic, Advanced and Trainers for Trainers workshop.

## XI. PLANS IF GRANTED RELEASE:

He plans to find a place to live with the help of Friends Outside. He has a friend who has offered assistance for living arrangements and his daughter will be able to help. A former employer has offered to either give him a job or locate a job. He would like to work in plumbing or construction and complete an apprenticeship. His plan is as viable as any other individual who must first move to a new location to find housing and a job. He has,

**2.**

apparently, savings from his work, a factor that is a positive sign. If paroled, the prognosis for successful, responsible, legal, prosocial community adjustment is good.

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

He exhibited no depressive or psychotic symptomatology. His intellectual functioning was estimated to be in the average range. He was calm, cooperative and alert. His mood, affect and flow of thought were all normal. His insight and judgment were good. He is currently participating in CCCMS and wants to take any groups that become available.

## CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     Polysubstance Dependence, in full remission in a controlled setting
AXIS II:    Antisocial Personality Disorder, by history
AXIS III:   Hepatitis C
AXIS IV:    Incarceration
AXIS V:     GAF=80

The prognosis for him maintaining his current mental status is good.

## XIII.  REVIEW OF LIFE CRIME:

The facts of the instant offense are not in dispute. He has consistently expressed his remorse and regret about his crimes and the harm he has caused. He last received a 128A Chrono in 2003.

## XIV.  ASSESSMENT OF DANGEROUSNESS:

Within a controlled setting, his violence potential is lower than average as he has generally been able to stay out of trouble for the past several years. If released to the community, his violence potential is considered to be about the same as the average citizen. His criminal past must be taken into account, however, as must his past testing noting that he twice scored in the moderate range of severity, in terms of violence potential. His last evaluator said that these testing results would likely *never* change, due to the instruments' attention to past criminal factors. This is useful information but never allows the inmate to "move beyond a score," allowing him to demonstrate improved maturity, judgment and insight. This evaluator cannot predict future free will and behavior but Mejia is doing all he reasonably can to convince the Board that he is a changed individual. Significant risk factors and precursors to violence include a return to drug/alcohol use and a return to an irresponsible, criminal lifestyle.

In 2005, the Board requested that Mejia get self-help, remain disciplinary-free and get positive Chronos. It appears he has done these things.

**3.**

## XV. CLINICAL OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

He is competent and responsible for his behavior, has the capacity to abide by institutional standards and has improved his behavior during his incarceration. He currently participates in CCMS and receives the benefits of being seen once every three months. To help him remain "on the straight and narrow," it is recommended he receive this same level of treatment while on parole. Mandatory conditions of parole and recommendations include monitoring for substance abuse, attendance in drug/alcohol treatment, periodic counseling and employment. Parole decisions should be based on custody factors.


W.K. Marek, Ph.D.
Psychologist
Correctional Training Facility-Soledad


B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility-Soledad

# EXHIBIT 6

# DECLARATION OF MELVIN MACOMBER, Ph.D.

I, Melvin Macomber, hereby declare:

1. I am a forensic psychologist, licensed to practice by and in the State of California, and have been practicing since 1975. I was previously awarded a Ph.D. degree in psychology by the University of Southern California, Los Angeles.

2. I am currently under contracts to provide psychological services at the Correctional Training Facility, Soledad, California, a California Department of Corrections (CDC) Prison, and by Kings County Superior Court. I was also been employed by CDC for 10 years as a Parole Agent, assigned to supervise life term inmates in the community.

3. From 1975 until the present time, I have been retained by the Board of Prison Terms (BPT) to write psychological assessments of life term inmates for the Board.

4. I have been asked several times to explain a new psychological evaluation format for life term inmates that was introduced in approximately 2001 at the California Men's Colony (CMC) by Dr. Essres and Dr. Livingston, The Essres/Livingston format concludes with a "Risk for Violence" section that utilizes three actuarial assessments, known as the V-RAG, HCR-20, and PCL-R, to predict the risk of future recidivism. These actuarial assessments were developed to allow recidivism potential to be predicted in a relatively short (60 to 90-minute) interview for the purpose of answering questions in a set format. The application of these actuarial assessments is limited to the specific population for which they were developed and tested.

5. From my experience, research, and review of published studies, the actuarial assessments employed in the Essres/Livingston format are inappropriate and unreliable when applied to life-term California inmates, and are likely in most instances to produce a "moderate" or "high" risk for future violence in these inmates, many of whom pose a considerably lower recidivism risk, as borne out by as many as 10 or more of their previous psychological evaluations based on standard, tested, more acceptable parameters.

**Declaration of Melvin Macomber, Ph.D. – Page 2**

6. According to the 1994 manual of the Violence Prediction Scheme (V-RAG), authored by its developers, the V-RAG is based on the recidivism potential of Canada's most severely mentally impaired violent sex offenders, most having acute psychoses and incarcerated for relatively short terms. Accordingly, the population used to develop the V-RAG had an inherently high likelihood of re-offending. The published manual for the V-RAG warns against inappropriate use of this assessment on any other population that is different from the original normative population.

7. In addition, the parole risk predictions generated by the actuarial assessments used in the Essres/Livingston format are based upon historical, static factors that never change. Accordingly, the risk for future violence predicted will never diminish regardless of how many times the inmate is re-evaluated in that format.

8. The use of an actuarial prediction scheme based upon mentally ill, violent, short-term inmates is inappropriate, and inherently unreliable as a tool for predicting future recidivism of California's long-term "lifer" population. Many such inmates have been incarcerated for 15 to 30 years or more, in many cases, from 1½ to 4 or more times the maximum prison term prescribed for the facts of their offenses by the State's parole regulations. Very few have any significant mental illness. Most have made significant positive changes over the years as a result of their age, maturity life experiences, and the therapy and self-help in which they have engaged while incarcerated.

9. According to my training, experience, and research, the most valid evaluations of the recidivism potential of California life-term inmates are those made prior to the Essres/Livingston format at CMC and those utilized at most other CDC institutions. These accurate evaluations are based on a thorough review of the inmate's file including his or her commitment offense, criminal, social, family, educational, vocational, medical, and mental health histories, and a structured, in-depth clinical interview conducted over several hours or days.

10. Research performed on lifer populations in other states, most of which grant parole to long-term inmates consistently, has shown that they seldom or never re-offend. This was also my own experience as a parole agent, supervising lifers in the community. A Pennsylvania prison report,

**Declaration of Melvin Macomber, Ph.D. - Page 3**

based on a surveillance of lifers in the community states, "Because criminal behavior declines with age, the release of an inmate after a substantial period of incarceration offers a substantially diminished risk of recidivism."

11. The most important factors on which the recidivism of a typical California life-term inmate can be predicted are the individual's growth and development of maturity, self-control, and insight into his or her former behavior. These factors are not adequately weighed in the Essres/Livingston format; because the actuarial assessments it employs rely on static, historical factors, mainly those existing prior to or at the time of the commitment offenses, the Essres/Livingston evaluations predict an inmate's violence potential <u>at the time of the offenses</u>, not present or future recidivism potential.

12. I believe that the application of the Essres/Livingston format and actuarial assessments, particularly the V-RAG and HCR-20, to formulate conclusions on which the Board of Prison Terms (BPT) bases parole suitability determinations for California lifers, is inappropriate, in most cases damaging to the reputations and parole opportunities of such inmates, and violates the ethical codes of competent testing. I have read several reports in which the authors of the actuarial schemes involved have explained how important it is to never use these measures inappropriately.

13. Because the Essres/Livingston format produces flawed and false parole risk predictions, I believe that such evaluations should be considered invalid and removed from the inmates' files to preclude inaccuracy, untoward results, and incurable damage.

I declare, under perjury, that my statements above are true, except where I have declared a belief or conclusion from training and experience, in which case they are true to that extent. I will gladly testify to these facts in a court of law, if called upon to do so.

Dated: __7- 7____, 2005, at _PASO ROBLES___, California

_Melvin Macomber PhD_
Declarant

3

# EXHIBIT 7

# MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS
## OCTOBER 2003 CALENDAR
## SUBSEQUENT HEARING #6
## CMC-East

## PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Jimmy Mejia is a 51-year-old (DOB: 04/17/52) divorced Hispanic male serving a sentence of 15 years to life for Murder Second Degree With The Use of a Firearm (handgun); Manslaughter By Vehicle; and Possession of a Firearm By an Ex-Felon. The date of the instant offense was 06/10/79 for which he was found guilty by Plea on 10/03/79, sentenced on 10/30/79 and arrived at California Department of Corrections (CDC) on 11/16/79 from Los Angeles County. He arrived at CMC-East on 07/26/90 from CMF-S. He is a U.S. citizen. His MEPD is 03/17/87. He has a mandatory minimum placement score of 28 and is medium A custody level.

Information for this evaluation was taken from the Subject's (S's) Central File, Unit Health Record, and a semistructured clinical interview of 2 hours duration on 08/11/03. Prior to the interview, S was presented with an informed consent form describing the nature and purpose of the interview, his right to refuse the interview and the limits to confidentiality therein. S chose to participate in the interview and signed his consent.

The most recent Mental Health Evaluation provided for the Board of Prison Terms available for this examiner was that of Dr, Rueschenberg CMC- East 06/20/02). Dr. Rueschenberg offered diagnoses of Polysubstance Dependence, in full remission in a controlled setting (304.8), Antisocial Personality Disorder, improved (301.7), Hepatitis C, treated with interferon and a Global Assessment of Functioning = 80. In regards to risk for violence, the author stated "at the present time, Mr. Mejia appears to fall into a category that represents a moderate risk for future violence in the community." The penultimate Board of Prison Terms Mental Health Evaluation was provided by L.W. Berning, Ph.D.(CMC-East 03/11/99). Dr. Berning offered diagnoses of Alcohol Dependence, in remission and Antisocial Personality Disorder, resolving. In regards to assessment for dangerousness, the author states "It is concluded that the inmates positive level of programming and his current perspective on alcohol are factors which reduce his violence in the community to that of below average." Inasmuch as both of these reports are comprehensive and conform to the format agreed upon by The Board of Prison Terms and CDC (memo dated 09/18/98), the current report will merely update these reports wherever relevant. It is also noted that the current evaluator has been asked by the previous Board of Prison Terms panel to address 4 issues in regards to this inmate, i.e.;

1. The prisoner's violence potential in the free community;
2. The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released;
3. The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;
4. The need for further therapy programs while incarcerated.

Instruments used for the current report are as follows:
1. Psychopathy Check List-Revised, Second Edition (PCL-R).
2. History Clinical Risk-20 (HCR-20).
3. Violence Risk Appraisal Guide (VRAG).

**DEVELOPMENTAL HISTORY:** S indicated that his earliest memory is of being 4 or 5-years-old and lost in a large department store. He states that he remembers telling the cashier that he was lost, his

**19**

# MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS – Page 2

parents were paged and he was re-united with them. When asked if he was frightened at the time he indicated "a little bit." S states he was born in Los Angeles, California and grew up in East L.A. in a home with good parents, with no abuse and in a Hispanic community. He states that he saw his father as a hard working person who never complained and believed that he should do the same. He also noted that his father drank on a daily basis but always after work and without any tragic results. He reports that both English and Spanish were spoken in the home and that S's primary language is English. He reports that as a teenager he began drinking beer and wine and joined a neighborhood gang. He also reports that he began experimenting with narcotics and with criminal activity.

**EDUCATION:**    S indicates that in elementary school he was suspended for one day when he got into an altercation with another child. He also reports that his first contact with the law was when he was 13 or 14-years-of-age and involved vandalism when he rolled a large rock down the hill which damaged the wall of a neighbors garage. However, it was noted by this examiner that the report in his file indicated that his first arrest was when he as 10-years-of-age (Care form dated 01/09/80 )

**FAMILY HISTORY:**    S reports that he had 2 half siblings, i.e. Helen 16 years older and Johnny 15 years older. Both siblings were by a previous marriage of his mother's. S indicates that he was not very close to these siblings because of their being older as well as having a different father. S reports that he never knew his grandparents because of their decease prior to his birth. As reported previously, S has been estranged from his family for a number of years.

**PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:**    There is no new information for this section.

**MARITAL/RELATIONSHIP HISTORY:**    S indicates that he receives "occasional letters" from his daughter and son from his first marital-like relationship. He states that the last letter he received was from his daughter April about 2 years ago. He states he hasn't heard from his son, Jimmy for about 3 years. S believes that his children are staying distant from him because of the information he gave to his son regarding their mother's death. This examiner asked S what he told his son and S indicated "I explained to him that I was playing around with a gun, pointed in the direction of their mother and shot it. I didn't think there was a bullet in the chamber."

S indicates that the last visit he received was by a female friend approximately 2 years ago with whom he has a friendship but is not romantically involved. S indicates that he has 4 or 5 close friends among the inmate population in this institution.

**MILITARY HISTORY:**    S apparently has never experienced military service.

**EMPLOYMENT/INCOME HISTORY:**    During the current reporting period (06/20/02 to 08/11/03), S has worked for the most part as a D-Quad rec-coordinator/runner receiving supervisory ratings initially of above average to exceptional and more recently average to less than average. There was also a supervisor comment on his last report that S "received a chrono 128 for poor attitude but has improved" (05/16/03). In regards to employment prior to incarceration, S noted that because of the example his father set as a hard working employee, S attempted to emulate him, got involved with the Plumber's Union as an apprentice but found that he was living "a double life". He explained that on one hand he had his life at work which had the appearance of being "normal" while on the other hand he was involved in  " dangerous lifestyle" which included alcohol, drugs and criminal activity.

MEJIA, JIMMY                 C10575                CMC-East                08/11/03                JL:mc

20

**MENTAL HEALTH EVALUATION**
**FOR THE BOARD OF PRISON TERMS – Page 3**

**SUBSTANCE ABUSE HISTORY:**   S states that he currently is attending Alcoholic's Anonymous regularly and Narcotic's Anonymous 1 time each month.  It was noted that there is a chrono in his file (04/14/03) verifying  Narcotic Anonymous attendance since 08/22/02.  S indicates that he does see himself as both alcoholic and addict and reports that he uses the 12 Steps.  In discussing the 12 Steps he appeared to have some general knowledge of the steps and purports the need to continue to use them in his life both now and if released upon parole.

In regards to the issue presented by The Board of Prison Terms regarding "the significance of alcohol/drugs...."  the following comments are offered.  First of all, there seems to be no question that alcohol and drugs were playing a major part in S's life at the time of the commitment offenses.  Around that time he had repeated DUI's, the report indicates that he was very intoxicated at the time of the automobile accident resulting in the death of 2 people (BAC = .24) as well as the time of his arrest for the Possession of a Firearm by a Felon.  S reported that he had been drinking as well at the time of the offense with the victim Thomas Biddle.  However it is obvious also that S's involvement with alcohol and other psycho-active substances was not the only factor involved in the commitment of said offenses.  That is, it doesn't entirely explain why he was carrying a loaded weapon while sitting in a bar nor does it explain why he discharged a loaded weapon while reportedly being pursued.  S apparently has some insight into this stating that at the time "I was being irresponsible.  I was involved with a criminal element at that time and it made me feel more gutsy."  More will be said in regards to this issue later when this examiner addresses the question regarding S's extent of exploring the commitment offense.

In regards to S's ability to refrain from use/abuse of psycho-active substances when released, the following comments are offered.  S obviously continued to use substances when he was first incarcerated in as much as he received 115's for use of Pruno.  However for a number of years, S indicates since 1986, he has reportedly continued abstinence from alcohol or drugs.  S indicates that he has been able to use the 12 Step Program as a basis for maintaining abstinence.  Based on S's program over the past 17 years, his use of recovery methods during that period of time, the outlook for continued and successful sobriety after release is optimistic.  Certainly, his parole plan should include requirements for ongoing and regular attendance of Substance Abuse Support Groups, random alcohol and drug testing and immediate revocation of parole if there were violations of either.

**MENTAL HEALTH HISTORY:**   During the current reporting period, S initiated contact with Mental Health Services as a result of  side effects from interferon treatment for Hepatitis C.  Side effects included skin rash, loss of appetite, headaches and mood swings.  Consequently he currently is receiving Mental Health Services at the CCCMS level of care with a diagnosis of Mental Disorder, NOS due to interferon treatment and a GAF = 60.  It was also noted that he has attended 3 workshops of Alternative to Violence Program with chronos dated 07/08/02, 12/18/02 and 03/24/03.  He also has a chrono (04/23/03) indicating completion of a 6 week FACT Substance Abuse Program.  In addition, he has a laudatory chrono in his file (04/23/03) for his involvement in the Inmate Peer Education Program.

**PLANS IF GRANTED RELEASE:**   S's plans for parole remain the same as previously reported. When asked if he believes he will receive a parole date he responded "I still have hope and aspirations". When asked, he indicated that he believes Alcoholic's Anonymous to be an important part of his parole program stating that "I'll need the fellowship with a sober group of individuals."  S indicated that he also knows now that he can ask for help if he has a need.

**MEJIA, JIMMY**          **C10575**          **CMC-East**          08/11/03          **JL:mc**

MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS – Page 4

## CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:** S arrived on time for his appointment and was appropriately groomed and dressed in prison garb. He was generally cooperative during the interview and maintained good eye contact throughout. He was oriented in all spheres. There were no unusual characteristics in regards to either standing or seated posture, gait or movements of limbs, trunk or face. As indicated above, his primary language is English in which he was able to express himself adequately with average spontaneity, rate, fluency and volume. During the interview process there were no indications of active thought or mood disorder. He denies any suicidal ideation, auditory or visual hallucinations.

Data were gathered from all resources available to this examiner to objectively ascertain the absence/presence of psychopathy for S. The data indicated a moderate level of psychopathy slightly higher than that of the average male offender with the highest subfactor being antisocial behavior. It may be noted that this was the same outcome as reported by the previous evaluator (Rueschenberg 06/20/02). It is not expected that this result would change, particularly over such a short interval of time and also because of the test having a high level of interator reliability. In regards to the Board's request to evaluate S for "the need for further therapy programs while incarcerated", it is certainly appropriate that S continue to attend and involve himself in substance abuse groups, self-help groups as well as treatment groups. Also, while he is receiving Mental Health Services he has access to more groups which could increase both his understanding of substance abuse and relapse prevention as well as other psychological issues.

**CRIMINAL HISTORY:** During the reporting period, S has not received any CDC115's or counseling chrono 128a's.

As indicated above, S states that at the time of the instant offense he was "living a double life". He reports that while he was working, a fellow employee read an article in the newspaper about some of S's criminal activity and asked him about it. S reports that he felt embarrassed and thought that perhaps his fellow employees would no longer trust him. He also indicated "I wanted to be like them." This examiner then asked why he didn't change his course of behavior and he responded "it was my own ignorance, wanting an exciting and risky life. I had a legitimate life on the side but I thought these people I was running around with were "cool". At the time I though what I was doing was all right because I didn't have any morals or scruples. I didn't value my life or other peoples lives. At that time my belief system was that if I get away with it then it was fine." When asked how his family responded to his criminal activity and arrests, he stated that it was "disturbing to them. My father told me after I got arrested that he was afraid I was going to be in prison when he died. It turned out that he was right." S also stated that because of his use of alcohol and drugs, he was "not thinking". This examiner asked S if either his wives ever complained about his drinking or drug use and he indicated that they did not. This examiner indicated that it's hard to believe that his wives would not be upset and complain about his lifestyle. S maintains "they kept quiet." This examiner also asked S about his thoughts regarding the family members of the victims of his crimes. He responded "it was a terrible thing. I not only destroyed the victim's lives but I destroyed many other lives as well. I feel bad that I caused that much pain and suffering. The only way that I can make amends is to not keep doing the same thing. Also, if I get the opportunity I will help someone who comes in here with an alcohol or drug problem and explain what happened to me." In regards to the victim of one of the commitment offense (Thomas Biddle) S states that he knew him slightly prior to the incident "but we weren't friends."

**22**

MEJIA, JIMMY                    C10575              CMC-East           08/11/03              JL:mc

**MENTAL HEALTH EVALUATION**
**FOR THE BOARD OF PRISON TERMS – Page 5**

In regards to the BPT's request that this examiner discuss "the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes" the following comments are offered. S appears to be aware of the devastation that his behavior has brought into peoples lives. However, it's not clear to whether he understands the wide swath that his destructive behavior cut. To further explain this, this examiner notes that S speaks of growing up in a family with both a mother and father from which he enjoyed a number of advantages. Because of his criminal behavior, there are at least 4 sets of families who never had that opportunity, i.e. the children of his first relationship after he shot and killed their mother, the children of his second relationship as a result of his incarceration 24 years to date, the children of the 2 victims of the automobile manslaughter and lastly, the 2 children of Thomas Biddle. As painful as it may be for Mr. Mejia, it seems to this examiner that while he is receiving Mental Health Services it will be helpful for him to give concentrated attention to this "wide swath". Furthermore, this examiner experiences some incredulity regarding S's accounts of the deaths of his two shooting victims, i.e. that both were accidental. The anticipated explanation would be that S was drinking, arguing with his wife, grabbed his gun and shot her. For the instant offense the expected description would be that he had been drinking, had a gun, was being chased and/or challenged by the victim and shot him. S could do some exploration of this issue in his groups and therapy.

**RISK FOR FUTURE VIOLENCE:** In this section, the Board's request for discussion of "the prisoners violence potential in a free community" will be addressed utilizing objective measures. It should be noted that these measures are identical to those used in the previous report (Rueschenberg 06/20/02) and consequently would not be expected to change in such a short period of time due to the stable nature of the instruments as well as mentioned above, the high inter-rater reliability. Nevertheless, this examiner re-scored these instruments with the result that all outcomes were in agreement from all instruments indicating a moderate level of risk for future violence by this S in the free community. At the beginning of the interview for the current report, Mr. Mejia asked this examiner why Dr. Rueschenberg's report of a moderate level of risk differed from previous psychological evaluations which indicated a low level of risk. The answer given to Mr. Mejia was speculative but suggested that previous evaluations were based primarily on more current programming giving less emphasis to past events and behavior. The instruments being used as indicated above use both static and dynamic factors. Consequently, the results will always be affected by historical events. As indicated in the previous section, S's past behavior is not insignificant regardless of changes he has made and should not be forgotten when evaluating for risk of future violence.


JOE LIVINGSTON, Ph.D.
Staff Psychologist

Original: C-File
     cc:  Unit Health Record
          Dictator
          Inmate

**23**

# EXHIBIT 8

## MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS
## OCTOBER 2003 CALENDAR
## SUBSEQUENT HEARING #6
## CMC-East

### PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Jimmy Mejia is a 51-year-old (DOB: 04/17/52) divorced Hispanic male serving a sentence of 15 years to life for Murder Second Degree With The Use of a Firearm (handgun); Manslaughter By Vehicle; and Possession of a Firearm By an Ex-Felon. The date of the instant offense was 06/10/79 for which he was found guilty by Plea on 10/03/79, sentenced on 10/30/79 and arrived at California Department of Corrections (CDC) on 11/16/79 from Los Angeles County. He arrived at CMC-East on 07/26/90 from CMF-S. He is a U.S. citizen. His MEPD is 03/17/87. He has a mandatory minimum placement score of 28 and is medium A custody level.

Information for this evaluation was taken from the Subject's (S's) Central File, Unit Health Record, and a semistructured clinical interview of 2 hours duration on 08/11/03. Prior to the interview, S was presented with an informed consent form describing the nature and purpose of the interview, his right to refuse the interview and the limits to confidentiality therein. S chose to participate in the interview and signed his consent.

The most recent Mental Health Evaluation provided for the Board of Prison Terms available for this examiner was that of Dr, Rueschenberg CMC- East 06/20/02). Dr. Rueschenberg offered diagnoses of Polysubstance Dependence, in full remission in a controlled setting (304.8), Antisocial Personality Disorder, improved (301.7), Hepatitis C, treated with interferon and a Global Assessment of Functioning = 80. In regards to risk for violence, the author stated "at the present time, Mr. Mejia appears to fall into a category that represents a moderate risk for future violence in the community." The penultimate Board of Prison Terms Mental Health Evaluation was provided by L.W. Berning, Ph.D.(CMC-East 03/11/99). Dr. Berning offered diagnoses of Alcohol Dependence, in remission and Antisocial Personality Disorder, resolving. In regards to assessment for dangerousness, the author states "It is concluded that the inmates positive level of programming and his current perspective on alcohol are factors which reduce his violence in the community to that of below average." Inasmuch as both of these reports are comprehensive and conform to the format agreed upon by The Board of Prison Terms and CDC (memo dated 09/18/98), the current report will merely update these reports wherever relevant. It is also noted that the current evaluator has been asked by the previous Board of Prison Terms panel to address 4 issues in regards to this inmate, i.e.;
1. The prisoner's violence potential in the free community;
2. The significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released;
3. The extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;
4. The need for further therapy programs while incarcerated.

Instruments used for the current report are as follows:
1. Psychopathy Check List-Revised, Second Edition (PCL-R).
2. History Clinical Risk-20 (HCR-20).
3. Violence Risk Appraisal Guide (VRAG).

**DEVELOPMENTAL HISTORY:** S indicated that his earliest memory is of being 4 or 5-years-old and lost in a large department store. He states that he remembers telling the cashier that he was lost, his

**MENTAL HEALTH EVALUATION**
**FOR THE BOARD OF PRISON TERMS – Page 2**

parents were paged and he was re-united with them. When asked if he was frightened at the time he indicated "a little bit." S states he was born in Los Angeles, California and grew up in East L.A. in a home with good parents, with no abuse and in a Hispanic community. He states that he saw his father as a hard working person who never complained and believed that he should do the same. He also noted that his father drank on a daily basis but always after work and without any tragic results. He reports that both English and Spanish were spoken in the home and that S's primary language is English. He reports that as a teenager he began drinking beer and wine and joined a neighborhood gang. He also reports that he began experimenting with narcotics and with criminal activity.

**EDUCATION:**    S indicates that in elementary school he was suspended for one day when he got into an altercation with another child. He also reports that his first contact with the law was when he was 13 or 14-years-of-age and involved vandalism when he rolled a large rock down the hill which damaged the wall of a neighbors garage. However, it was noted by this examiner that the report in his file indicated that his first arrest was when he as 10-years-of-age (Care form dated 01/09/80 )

**FAMILY HISTORY:**    S reports that he had 2 half siblings, i.e. Helen 16 years older and Johnny 15 years older. Both siblings were by a previous marriage of his mother's. S indicates that he was not very close to these siblings because of their being older as well as having a different father. S reports that he never knew his grandparents because of their decease prior to his birth. As reported previously, S has been estranged from his family for a number of years.

**PSYCHOSEXUAL DEVELOPMENT AND  SEXUAL ORIENTATION:**    There is no new information for this section.

**MARITAL/RELATIONSHIP HISTORY:**    S indicates that he receives "occasional letters" from his daughter and son from his first marital-like relationship. He states that the last letter he received was from his daughter April about 2 years ago. He states he hasn't heard from his son, Jimmy for about 3 years. S believes that his children are staying distant from him because of the information he gave to his son regarding their mother's death. This examiner asked S what he told his son and S indicated "I explained to him that I was playing around with a gun, pointed in the direction of their mother and shot it. I didn't think there was a bullet in the chamber."

S indicates that the last visit he received was by a female friend approximately 2 years ago with whom he has a friendship but is not romantically involved. S indicates that he has 4 or 5 close friends among the inmate population in this institution.

**MILITARY HISTORY:**    S apparently has never experienced military service.

**EMPLOYMENT/INCOME HISTORY:**    During the current reporting period (06/20/02 to 08/11/03), S has worked for the most part as a D-Quad rec-coordinator/runner receiving supervisory ratings initially of above average to exceptional and more recently average to less than average. There was also a supervisor comment on his last report that S "received a chrono 128 for poor attitude but has improved" (05/16/03). In regards to employment prior to incarceration, S noted that because of the example his father set as a hard working employee, S attempted to emulate him, got involved with the Plumber's Union as an apprentice but found that he was living "a double life". He explained that on one hand he had his life at work which had the appearance of being "normal" while on the other hand he was involved in  " dangerous lifestyle" which included alcohol, drugs and criminal activity.

**2.**

MEJIA, JIMMY                    C10575                    CMC-East                    08/11/03                    JL:mc

**MENTAL HEALTH EVALUATION**
**FOR THE BOARD OF PRISON TERMS – Page 3**

**SUBSTANCE ABUSE HISTORY:**   S states that he currently is attending Alcoholic's Anonymous regularly and Narcotic's Anonymous 1 time each month. It was noted that there is a chrono in his file (04/14/03) verifying Narcotic Anonymous attendance since 08/22/02. S indicates that he does see himself as both alcoholic and addict and reports that he uses the 12 Steps. In discussing the 12 Steps he appeared to have some general knowledge of the steps and purports the need to continue to use them in his life both now and if released upon parole.

In regards to the issue presented by The Board of Prison Terms regarding "the significance of alcohol/drugs...." the following comments are offered. First of all, there seems to be no question that alcohol and drugs were playing a major part in S's life at the time of the commitment offenses. Around that time he had repeated DUI's, the report indicates that he was very intoxicated at the time of the automobile accident resulting in the death of 2 people (BAC = .24) as well as the time of his arrest for the Possession of a Firearm by a Felon. S reported that he had been drinking as well at the time of the offense with the victim Thomas Biddle. However it is obvious also that S's involvement with alcohol and other psycho-active substances was not the only factor involved in the commitment of said offenses. That is, it doesn't entirely explain why he was carrying a loaded weapon while sitting in a bar nor does it explain why he discharged a loaded weapon while reportedly being pursued. S apparently has some insight into this stating that at the time "I was being irresponsible. I was involved with a criminal element at that time and it made me feel more gutsy." More will be said in regards to this issue later when this examiner addresses the question regarding S's extent of exploring the commitment offense.

In regards to S's ability to refrain from use/abuse of psycho-active substances when released, the following comments are offered. S obviously continued to use substances when he was first incarcerated in as much as he received 115's for use of Pruno. However for a number of years, S indicates since 1986, he has reportedly continued abstinence from alcohol or drugs. S indicates that he has been able to use the 12 Step Program as a basis for maintaining abstinence. Based on S's program over the past 17 years, his use of recovery methods during that period of time, the outlook for continued and successful sobriety after release is optimistic. Certainly, his parole plan should include requirements for ongoing and regular attendance of Substance Abuse Support Groups, random alcohol and drug testing and immediate revocation of parole if there were violations of either.

**MENTAL HEALTH HISTORY:**   During the current reporting period, S initiated contact with Mental Health Services as a result of side effects from interferon treatment for Hepatitis C.  Side effects included skin rash, loss of appetite, headaches and mood swings. Consequently he currently is receiving Mental Health Services at the CCCMS level of care with a diagnosis of Mental Disorder, NOS due to interferon treatment and a GAF = 60. It was also noted that he has attended 3 workshops of Alternative to Violence Program with chronos dated 07/08/02, 12/18/02 and 03/24/03. He also has a chrono (04/23/03) indicating completion of a 6 week FACT Substance Abuse Program. In addition, he has a laudatory chrono in his file (04/23/03) for his involvement in the Inmate Peer Education Program.

**PLANS IF GRANTED RELEASE:**   S's plans for parole remain the same as previously reported. When asked if he believes he will receive a parole date he responded "I still have hope and aspirations". When asked, he indicated that he believes Alcoholic's Anonymous to be an important part of his parole program stating that "I'll need the fellowship with a sober group of individuals." S indicated that he also knows now that he can ask for help if he has a need.

**3.**

MEJIA, JIMMY              C10575              CMC-East              08/11/03              JL:mc

MENTAL HEALTH EVALUATION
FOR THE BOARD OF PRISON TERMS – Page 4

## CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:** S arrived on time for his appointment and was appropriately groomed and dressed in prison garb. He was generally cooperative during the interview and maintained good eye contact throughout. He was oriented in all spheres. There were no unusual characteristics in regards to either standing or seated posture, gait or movements of limbs, trunk or face. As indicated above, his primary language is English in which he was able to express himself adequately with average spontaneity, rate, fluency and volume. During the interview process there were no indications of active thought or mood disorder. He denies any suicidal ideation, auditory or visual hallucinations.

Data were gathered from all resources available to this examiner to objectively ascertain the absence/presence of psychopathy for S. The data indicated a moderate level of psychopathy slightly higher than that of the average male offender with the highest subfactor being antisocial behavior. It may be noted that this was the same outcome as reported by the previous evaluator (Rueschenberg 06/20/02). It is not expected that this result would change, particularly over such a short interval of time and also because of the test having a high level of interator reliability. In regards to the Board's request to evaluate S for "the need for further therapy programs while incarcerated" , it is certainly appropriate that S continue to attend and involve himself in substance abuse groups, self-help groups as well as treatment groups. Also, while he is receiving Mental Health Services he has access to more groups which could increase both his understanding of substance abuse and relapse prevention as well as other psychological issues.

**CRIMINAL HISTORY:** During the reporting period, S has not received any CDC115's or counseling chrono 128a's.

As indicated above, S states that at the time of the instant offense he was "living a double life". He reports that while he was working, a fellow employee read an article in the newspaper about some of S's criminal activity and asked him about it. S reports that he felt embarrassed and thought that perhaps his fellow employees would no longer trust him. He also indicated "I wanted to be like them." This examiner then asked why he didn't change his course of behavior and he responded "it was my own ignorance, wanting an exciting and risky life. I had a legitimate life on the side but I thought these people I was running around with were "cool". At the time I though what I was doing was all right because I didn't have any morals or scruples. I didn't value my life or other peoples lives. At that time my belief system was that if I get away with it then it was fine." When asked how his family responded to his criminal activity and arrests, he stated that it was "disturbing to them. My father told me after I got arrested that he was afraid I was going to be in prison when he died. It turned out that he was right." S also stated that because of his use of alcohol and drugs, he was "not thinking". This examiner asked S if either his wives ever complained about his drinking or drug use and he indicated that they did not. This examiner indicated that it's hard to believe that his wives would not be upset and complain about his lifestyle. S maintains "they kept quiet." This examiner also asked S about his thoughts regarding the family members of the victims of his crimes. He responded "it was a terrible thing. I not only destroyed the victim's lives but I destroyed many other lives as well. I feel bad that I caused that much pain and suffering. The only way that I can make amends is to not keep doing the same thing. Also, if I get the opportunity I will help someone who comes in here with an alcohol or drug problem and explain what happened to me." In regards to the victim of one of the commitment offense (Thomas Biddle) S states that he knew him slightly prior to the incident "but we weren't friends."

MEJIA, JIMMY          C10575          CMC-East          08/11/03          JL:mc

**4.**

**MENTAL HEALTH EVALUATION**
**FOR THE BOARD OF PRISON TERMS – Page 5**

In regards to the BPT's request that this examiner discuss "the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes" the following comments are offered. S appears to be aware of the devastation that his behavior has brought into peoples lives. However, it's not clear to whether he understands the wide swath that his destructive behavior cut. To further explain this, this examiner notes that S speaks of growing up in a family with both a mother and father from which he enjoyed a number of advantages. Because of his criminal behavior, there are at least 4 sets of families who never had that opportunity, i.e. the children of his first relationship after he shot and killed their mother, the children of his second relationship as a result of his incarceration 24 years to date, the children of the 2 victims of the automobile manslaughter and lastly, the 2 children of Thomas Biddle. As painful as it may be for Mr. Mejia, it seems to this examiner that while he is receiving Mental Health Services it will be helpful for him to give concentrated attention to this "wide swath". Furthermore, this examiner experiences some incredulity regarding S's accounts of the deaths of his two shooting victims, i.e. that both were accidental. The anticipated explanation would be that S was drinking, arguing with his wife, grabbed his gun and shot her. For the instant offense the expected description would be that he had been drinking, had a gun, was being chased and/or challenged by the victim and shot him. S could do some exploration of this issue in his groups and therapy.

**RISK FOR FUTURE VIOLENCE:** In this section, the Board's request for discussion of "the prisoners violence potential in a free community" will be addressed utilizing objective measures. It should be noted that these measures are identical to those used in the previous report (Rueschenberg 06/20/02) and consequently would not be expected to change in such a short period of time due to the stable nature of the instruments as well as mentioned above, the high inter-rater reliability. Nevertheless, this examiner re-scored these instruments with the result that all outcomes were in agreement from all instruments indicating a moderate level of risk for future violence by this S in the free community. At the beginning of the interview for the current report, Mr. Mejia asked this examiner why Dr. Rueschenberg's report of a moderate level of risk differed from previous psychological evaluations which indicated a low level of risk. The answer given to Mr. Mejia was speculative but suggested that previous evaluations were based primarily on more current programming giving less emphasis to past events and behavior. The instruments being used as indicated above use both static and dynamic factors. Consequently, the results will always be affected by historical events. As indicated in the previous section, S's past behavior is not insignificant regardless of changes he has made and should not be forgotten when evaluating for risk of future violence.

JOE LIVINGSTON, Ph.D.
Staff Psychologist

Original: C-File
    cc:  Unit Health Record
         Dictator
         Inmate

**5.**

MEJIA, JIMMY              C10575          CMC-East          08/11/03          JL:mc

**Melvin Macomber, Ph.D.**

Forensic Psychology
CA Lic. # Psy 10145, M16125

Diplomate-American Board of Psychological Specialties-Forensic Clinical Psychology
Board Certified-American Board of Forensic Medicine;  Board Certified-American Board of Disability Analysts;
Diplomate-American Board of Professional Disability Consultants    Fellow--American College of Forensic Examiners

6873 Douglas Blvd, #152, Granite Bay, CA 95746   (916) 652-7014

## CLINICAL ASSESSMENT

| | |
|---|---|
| **Inmate Name:** | **Mejia, Jimmy** |
| **CDC Number:** | C-10575 |
| **Date of Birth:** | 4-17-52 (age 54) |
| **Institution:** | **Correctional Training Facility--Soledad** |
| **Commitment Date:** | 11-16-79 |
| **Date of Offense:** | 6-10-79 |
| **Offense:** | **PC 187 Murder, Second Degree** |
| **Sentence:** | **15 years to Life** |
| **Evaluation Date:** | 9-22-06 |
| **Date Typed:** | 9-27-06 |

**Identifying Information:**  Mr. Jimmy Mejia is a 54-year-old, divorced, second term, Hispanic male from Los Angeles County. He has been in custody now for 27 years. He has prior offenses for Manslaughter by Motor Vehicle, for which he discharged, and for Possession of a Firearm by an Ex-Felon, for which he received an 8-month sentence.  His MEPD is 7-16-89.

Since the psychosocial history has been thoroughly reviewed in prior evaluations, this information will not be repeated at this time.

**Sources of Information:**   This evaluation is based upon a single, two-hour, psycho-diagnostic interview at Correctional Training Facility—Soledad.  Also, several psychological tests were administered, including the Millon Clinical Multiaxial Inventory-III, the Psychological Inventory of Criminal Thinking Styles, the Level of Service Inventory, the Substance Abuse Subtle Screening Inventory, and the Iorns Inventory.  Also, his prior psychological evaluations were reviewed.

*5.*

## XII.  Current Mental Status/Treatment Needs:

Mr. Mejia is a healthy, alert individual, who looks his chronological age. Hygiene and grooming were good. He was well oriented, and his thinking was rational, logical, and coherent. He was functioning in the high average ranges intellectually by impression. His speech was normal, fluent, and goal oriented. His affect was appropriate. There was no evidence of depression or of anxiety. There was no evidence of neurological impairment. He related in a serious, open, cooperative, self-revealing manner. Eye contact throughout the interview was good. His memory was intact. His judgment was intact. He was not at all evasive or uncertain in his answers. He appeared to be a sincere individual, who is open and honest and accepts full responsibility for his past irresponsible behavior.

Mr. Mejia is currently on the Correctional Clinical Case Management System, and he is treated with 15 mg daily of Remeron, which he uses to assist him in sleeping. He began participating in the mental health system, when he was administered Interferon for treatment of Hepatitis C. Interferon is known to cause depression, and, as a result, he was started on antidepressant medication. The medical treatment of his hepatitis was successful, and there is no evidence of Hepatitis C at this point in time. However, even though he was given the opportunity of discontinuing his medication, he stated that it was beneficial to him, and that it did help him sleep better at night. Therefore, he has been continued on this medication, and as a result, he has been continued on the mental health system program, although there is no evidence of any mental health problems at this time.

Mr. Mejia does have an extensive criminal record beginning at the age of 14, when he was sent to California Youth Authority for Vehicle Theft. One year later he was sent back to the Youth Authority for committing a robbery. As an adult, he was returned to California Youth Authority in 1970 for Assault with the Intent to Commit Murder. One year later he received a commitment for Burglary and received three months summary probation. He has five arrests for drunk driving. He received another commitment for Assault to Commit Murder in 1974 and was sent to prison. He paroled to Los Angeles County and discharged his parole on 7/1/78. In 1997 and 1978, he received two arrests for drunk driving.

He is the youngest of two sons and one daughter, born to the intact marriage of his parents. He was raised in the East Los Angeles area in the Boyle Heights district. At a young age he became an active member of a neighborhood gang called the "Flat Gang." He completed his high school diploma while he was an inmate at the Youth Training School in 1970. He began using drugs during his teenage years. He initially started with marijuana, but graduated to the use of heroin, barbiturates, and

methamphetamines.  He stated that his main problem was alcohol abuse.

   As an adult he was sent to prison after being convicted for Involuntary Manslaughter subsequent to the shooting death of his common-law wife in May, 1974.  He had two children from that relationship.  In 1977, he developed a relationship with Lisa Hernandez, and he fathered three children.  They were married, but have since divorced.  He was employed in the community as an apprentice plumber through the Plumber's Union.  He has not had any gang affiliation since his prison commitment in 1974.  He has been disciplinary for the last 20 years.  He continued to use alcohol in the form of prison made alcohol, and, as a result, he received several disciplinaries related to this.  There is no evidence in his disciplinary record of any possession of weapons, of assaults on others, of participation in riots, or of any other violent activities.

He has continuously participated in Alcoholics Anonymous over the years.  He also functions as an Alternatives to Violence facilitator, in which he has led nine workshops.  Prior to his involvement as a workshop leader, he completed the Basic and Advanced Alternatives to Violence program.  He also completed the trainer's training for this program.


## Psychological Test Results

The Millon Clinical Multiaxial Inventory-III:  This is a 175-item inventory that is designed to identify Axis I and Axis II psychiatric disorders.  A valid profile was produced.  There is no evidence of any psychopathology in the test results.  There were no scores in the clinical range.  His scores show that he is free from an Axis II personality disorder.  There was no Axis I clinical disorders evident, and no scores were elevated.  In this evaluation he openly admitted that he had a history of drug dependence.  This is no longer a current problem.  This inventory also assesses antisocial thinking and values.  His antisocial score was very low, indicating that he is no more antisocial than the average citizen at this time in his life.


Psychological Inventory of Criminal Thinking Styles by Glenn D. Walters, Ph.D., 2001:  This instrument is designed to identify a person's cognitions in the form of attitudes, beliefs, and thinking styles.  There are eight thinking styles that are assessed. *Mollification* is a tendency to blame one's criminal involvement on others.  *Cut Off* is a measure of impulsivity.  *Entitlement* is a sense of ownership, privilege and uniqueness. *Power Orientation* is a measure of the desire for power and control over others. *Sentimentality* is a belief that performing good deeds erases the harm done.  *Super*

**7.**

*Optimism* is the belief that one will be able to postpone or avoid negative consequences of criminal acts. *Cognitive Indolence* is a tendency to take short-cuts and the easy way around problems. *Discontinuity* reflects a tendency to lose sight of one's goals and to be easily sidetracked by environmental events. Mr. Mejia's scores were all in the normal range, indicating that he does not have any criminal thinking styles at this point in his life.

The Level of Service Inventory--(LSI-R): This inventory was developed in 1995 to assist service providers in the assessment of the offender's need for services on probation or on parole. It is a quantitative survey of attributes of offenders and of their situations to determine their level of risk. It addresses the offender's criminal history as well as his current education levels, employment, family and marital adjustments, choice of associates, current alcohol and drug problems, and his current attitudes toward society's rules and regulations. Mr. Mejia obtained an overall score that places him in the low risk, low needs area. This score indicates that he would make a good adjustment in open and free society. His score placed him at the 8.6 accumulative frequency in comparison to other prison inmates. This actuarial measure predicts that Mr. Mejia will make a good adjustment in society.

The Substance Abuse Subtle Screening Inventory (SASSI-R): The SASSI uses subtle items that seem unrelated to substance use to enable the evaluator to recognize individuals with alcohol or other drug problems even when they do not acknowledge substance use or symptoms. This measure provides decision rules that identify Substance Dependence Disorder with an empirically tested accuracy of 94 percent. This measure is also 93 percent accurate in identifying those who do not have a Substance Dependence Disorder. This measure was first published in 1990, and since that time it has been revised, upgraded and improved. This measure is highly respected and often used in psychiatric settings that are dealing with substance abuse issues. The results of the SASSI show that Mr. Mejia was not defensive or guarded in his responses. His scores show low defensiveness. He openly admitted to a serious problem with drugs and alcohol in the past. He also indicated that his problems with alcoholism have contributed to his legal problems as well as to his family problems. His current test pattern does not indicate a similarity to people with substance dependence disorders. His subtle attributes score was low, indicating that he does not have a personality structure similar to people with substance abuse problems. His symptoms scale shows that he does not have any current symptoms associated with drug or alcohol abuse. This test indicates that Mr. Mejia has a low probability of having a substance dependence disorder at this point in his life.

The Inventory of Offender Risk, Needs and Strengths: This is a recent inventory developed in 2006 to determine risk level for community placement. This measure

*8.*

assesses static risk factors, dynamic need factors or treatment needs, and protective strength factors such as personal resources and environmental support. These three factors are evaluated in a formula that produces an overall risk index. Mr. Mejia's scores were compared to the average citizen in the community. His overall risk index, compared to the average citizen in the community, was 55 T-score, which indicates that his responses were no different than the average male his age in the community. Mr. Mejia had a low score on criminal orientation, psychopathy, interpersonal problems, aggression and negative social influences. His dynamic need index score was at the 44 T-score level, which is quite low and indicates that he is not in need of further treatment. His protective strength index score was in the average range, indicating that he does have adequate resources and support in the community. The overall results of this assessment indicate that he will do well on parole. The value of this inventory is that it compares his responses and attitudes to those of the average citizen in the community. The conclusion is that he will not pose a risk factor in the community.

Based upon current psychological testing, as well as on the psycho-diagnostic interview, Mr. Mejia is free from a diagnosable mental disorder.

## Current Clinical Diagnosis:

| | |
|---|---|
| Axis I | Mo Mental Disorder |
| Axis II | No Personality Disorder |
| Axis III | No Physical Disorder |
| Axis IV | Current Stressors: Lifetime Incarceration |
| Axis V | Current GAF: 90 |

## Review of Previous Psychological Evaluations:

On 10/15/91, he completed a Category "T" evaluation, after participating in that program for one year. Dr. Orling reported that he made substantial effort toward self-improvement in the five years between his Category "X" report and his completion of the Category "T" program. The diagnostic impression was Antisocial Personality Disorder—Mild by History—Improved. Reports indicated that there was no evidence of any mental disorder, and that he was considered at the time to have no need for further individual therapy.

On 10/20/94, a psychological evaluation by Michael Selby, Ph.D., Staff Psychologist at CMC-East, indicated that he had completed his welding certificate, and that he had completed several college courses. He had also completed several therapeutic groups and was currently attending Patten College, taking courses in Biblical theology. Diagnostic impression was Polysubstance Dependence, Resolving; and Antisocial Personality, Mild, Resolving.

His violence potential, if released to the community, was significantly below that of the average inmate. He also had participated in a sufficient number of self-help groups and therapy groups.

On 1/29/96, a psychological evaluation by Erich Rueschenberg, Ph.D., Psychologist at CMC-East, indicated that he expressed feelings of remorse, noting that he had caused a lot of people harm and had destroyed a lot of lives. He expressed sorrow for the hurt and pain that he has caused his victims. He had also confessed to his two children that he was responsible for their mother's death. He did this, because they asked him for details, and he wanted to fulfill the AA step of confession and making amends. He stated that this was very difficult to do, and that his children were very hurt. He stated that he is now trying to assume responsibility for his criminal actions in hopes of developing a positive relationship with his children. The evaluator stated that he continues to show substantial improvement, and that there was no evidence of any mental illness or mental health issues. His current level of dangerousness compared to other inmates was seen as below average.

On 3/11/99, in a psychological evaluation by L. W. Berning, Ph.D., Psychologist at CMC-East, his positive programming was noted, and his violence potential, if released to the community, was seen as being below average.

On 6/20/02, in a psychological evaluation by Erich Rueschenberg, Ph.D., Psychologist at CMC-East, it was stated that Mr. Mejia accepted full responsibility for the commitment offense, in which he shot the victim. Mr. Mejia stated that at the time of the commitment offense, he was living a criminal and substance abuse lifestyle, and that he was immature and irresponsible. He expressed remorse for the victim's death. The Hare scale (PCL-R) was administered, and Mr. Mejia scored within the moderate range of severity. Mr. Mejia had a prominent antisocial background, but he did not fit the full clinical picture of a psychopathic personality. It was noted that the instrument is based upon static risk factors and is not likely to change over time. He also administered the History Clinical Risk-20 (HCR-20), and Mr. Mejia scored within the moderate range of severity. The Violence Risk Appraisal Guide (VRAG) also indicated a score within the moderate range of severity. Dr.

*10.*

Rueschenberg concluded that Mr. Mejia presented a moderate risk for future violence in the community based upon these measures.

On 8/11/03, a psychological evaluation by Joe Livingston, Ph.D., Psychologist at CMC-East, reviewed the previous risk assessment measures given by Dr. Rueschenberg. He concluded that there was a moderate level of psychopathy, slightly higher than the average male offender. He stated that Mr. Mejia is aware of the devastation that his behavior has brought into people's lives, but that it is not clear whether he understands the "wide swath that his destructive behavior cut." Dr. Livingston believed that Mr. Mejia's statements about the deaths of his two shooting victims were not credible. Dr. Livingston claimed that Mr. Mejia stated that they were both accidental. He concluded that, based on the administration of the actuarial measures noted above, he posed a moderate level of risk for future violence in the community.

On 9/3/06, a psychological evaluation by William Marek, Ph.D., Psychologist at Soledad, indicated a diagnostic impression of Polysubstance Dependence in Full Remission, Antisocial Personality Disorder by History, and a GAF of 80. The evaluator indicated that Mr. Mejia has consistently expressed his remorse and regret about the crimes and harm that he has caused. His violence potential, if released to the community, was seen as low, and no greater than the average citizen in the community. Dr. Marek noted that past reports have indicated a moderate range of severity based upon actuarial measures. Dr. Marek pointed out that, since these measures are based upon static factors, this score will never change. Dr. Marek pointed out that these measures will not allow the inmate to "move beyond a score," not allowing him to demonstrate improvement, maturity, judgment, and insight.

Discussion of Actuarial Measures: These three actuarial measures are highly inappropriate and were misused in the evaluations by Dr. Livingston and by Dr. Rueschenberg. The misuse of psychological measures is a grave error, extremely misleading, and a violation of test standard ethics. I will explain the reasons why. The psychopathic checklist (PCL-R) manual warns against inappropriate use of this measure. "The potential for harm is considerable if the PCL-R is used incorrectly, or if the user is not familiar with the clinical and empirical literature pertaining to Psychopathy." (p. 5 of the Hare Psychopathic Checklist-Revised Manual, 1991). The author states that users should "limit their use of the PCL-R to those populations to which it has been fully validated." The validated populations are listed in the manual. They consist of adult male forensic populations such as those found in "institutional

or community correctional facilities, forensic psychiatric hospitals and pretrial evaluation or detention facilities." The validated populations were short-term inmates. Mr. Mejia is not a short-term inmate. He has served 27 years in custody at this point. He is not at all like those involved in the standardization sample. In addition, on page 32 of the manual, the author states, "psychopathic criminals generally commit more crimes, receive more convictions, and spend more time in prison before age 40 than do non-psychopathic criminals. However, after the age of 40, they show a dramatic drop in overt criminal activities, a decrease apparent in longitudinal as well as cross-sectional analyses; by the age of 40-45 years, psychopathic criminals are at no greater risk for conviction than are other criminals." Dr. Hare goes on to quote further research that supports this fact. In other words, this PCL-R should not be administered to inmates older than the 40-45 year category, because this test is no longer a valid indicator of risk for convictions for that age group. Mr. Mejia was 50 years old at that time.

Dr. Livingston and Dr. Rueschenberg used the HCR-20. On page 5 of the manual of this actuarial measure, the authors warn that the HCR-20 should be used as an aid to memory, and as a research instrument that should be used with great caution. This measure was developed to assess potential for violent behavior in forensic psychiatric settings. Although some correctional settings were used, most of the sample was taken from psychiatric populations. There are absolutely no validation studies using this measure in the literature as it relates to life term inmates, who have spent years in custody.

Dr. Livingston and Dr. Rueschenberg used the Violence Risk Appraisal Guide (VRAG) and claimed that Mr. Mejia had obtained a score as a moderate risk for violence. The authors of the manual on page 24 warn the users of this actuarial measure that they must know the consequences of their predictions when using this instrument. The user is warned to not use the instrument inappropriately. On page 29, the manual describes the population sample used to develop statistics of re-offense for this measure. The sample consisted of 332 men admitted to Oak Ridge Psychiatric Hospital for treatment and 286 additional men assessed but not retained beyond the evaluation period of a month or two. Oak Ridge is a secure mental hospital that receives patients from the courts, from correctional services, and from other provincial psychiatric hospitals. All patients are known for high levels of violent conduct. Again, Mr. Mejia does not even resemble the population sample with which this measure was developed. He is not a psychiatric patient. He does not currently hold any psychiatric diagnosis. He has been incarcerated for 27 years. All of the people in the sample were short-term psychiatric patients that were stabilized on medications and released to the community. To apply this measure to Mr. Mejia is grossly irresponsible, grossly unethical and grossly misleading.

## XIII.  Review of Life Crime:

Mr. Mejia accepts full responsibility for his actions in the commitment offense in which Thomas Biddle, age 18, was shot to death on 6/10/79. He stated that his crime partner and he had intended to rob a drug dealer. He stated that he was armed with a 45-caliber handgun, and his crime partner had a 22-caliber rifle. As he was walking up the stairs, he stated that he heard voices below, and when he looked down he saw a teenage boy talking to his crime partner. The boy left the area and went inside one of the apartments downstairs. At that point Mr. Mejia stated that he decided not to go through with the robbery, but instead ran back to their car. As they were approaching the car, he saw that the teenage boy and Thomas Biddle were coming after them. When they were about 50 feet away he told Mr. Biddle, "Let me go. We don't need to hurt each other." However, Mr. Biddle and the teenage boy kept advancing towards Mr. Mejia, and when Tommy Biddle raised his weapon, Mr. Mejia fired three shots that he thought were above the victim's head. Unfortunately, one of the bullets hit Mr. Biddle's left shoulder, as he and the other boy turned and ran away back towards their apartment building. He had no idea that he had shot the victim at that time and learned about this later. Mr. Mejia stated that he knew Tommy Biddle from prior contacts, and he knew that he was one of the individuals that provided protection for the drug dealer.

Mr. Mejia wanted to make it clear to this evaluator that his criminal actions that resulted in the death of the victims were not accidental, other than the time when he was playing with the gun and accidentally shot his common-law wife. He stated that in the case of Mr. Biddle, he deliberately shot Mr. Biddle, trying to shoot over his head. The fact that Mr. Biddle was shot was not an accident. It was a deliberate action on his part. He stated, "I am responsible for his death. I intended to rob the drug dealer, and I did not intend to hurt Mr. Biddle, but Mr. Biddle was killed due to my actions. This was not accidental."

Mr. Mejia is very aware of the great devastation that he has caused others, including loss of life, when he was living a criminal lifestyle and using drugs and alcohol. He has consistently expressed deep feelings of sorrow and remorse at the injury that he has caused others. When questioned about his prior irresponsible behavior, he stated that on 5/12/78, under the influence of alcohol, he was driving a vehicle at a high rate of speed, and he went through a traffic signal, which resulting in his striking another vehicle, which was driven by a 35-year-old woman. The driver of the other vehicle died from her injuries. There was a 74-year-old passenger in the automobile that was struck, who also died from her injuries. In 1974, Mr. Mejia was convicted of Involuntary Manslaughter and sent to prison as the result of the shooting death of his

*13.*

common-law wife in May, 1974. He stated that at the time he was extremely intoxicated on alcohol and marijuana. He was playing with a 25-caliber automatic pistol, unloading and reloading the gun clip. He stated that the gun accidentally discharged while he was playing with it, and the result was that he accidentally shot Rachel, his wife. He stated that this shooting was accidental and was not at all purposeful, as Dr. Livingston thought that it was on the last page of his psychological evaluation. Mr. Mejia fully recognizes the fact that he was living a totally irresponsible life, and that his irresponsible life was the cause for this unfortunate offense.

## XIV.  Assessment of Dangerousness:

A. In considering the potential for dangerous behavior in the institution, Mr. Mejia has been incarcerated for 27 years on this offense. He has remained disciplinary free for the last 20 years. His earlier disciplinaries, over 20 years ago, were associated with the use of alcohol. He has never received any disciplinaries for aggressive behavior, participation in riots, possession of weapons, or violent acts. He lives in a normal institutional environment, where he is surrounded by antisocial individuals, and many of them eager to steal property or to engage in violence. Soledad recently has experienced numerous racial riots, and he has never been involved in any of these activities. Remaining disciplinary free in this environment is a commendable achievement. The potential for dangerous behavior in the institutional environment is definitely below average in comparison to other inmates.

B. In considering the potential for dangerous behavior if released to the community on parole, Mr. Mejia has grown in maturity, self-awareness, and self-control over the years. At this point in his life, there are more positive factors than there are negative factors. I agree with the previous evaluator, Dr. Marek, who stated that he does not pose any more risk to society than the average citizen in the community. These conclusions are supported by the following facts:

1. Although Mr. Mejia has a history of delinquent behavior as well as a serious history of criminal activities as an adult, current psychological testing, as well as his 20 years of good adjustment in the institution, shows that he is not criminally oriented. Psychological testing shows that he is no longer criminally oriented in his thinking and values. His values at this point in his life are pro-social.

2. Mr. Mejia no longer has any antisocial personality features. He does have

*14.*

feelings of concern and compassion toward others. He does feel sorrow and remorse about the numerous people he has injured in his lifetime due to his irresponsible actions in the past. Research is clear, indicating that antisocial personality is not a significant factor in most cases after the age of 40. Mr. Mejia is 54 years of age.

3. Mr. Mejia has completed several vocational trades in the institution. He has completed Vocational Welding, Vocational Drafting, Vocational Sewing Machine Repair, and Vocational Data Processing. In addition, he is also skilled as a plumber. He is a member of the Labor Union and the Plumber and Pipe Fitters Union. He continues to work as a plumber in the institution, keeping his skills current. As a result of the skills that he has developed, he will be readily employable in the community. He will have absolutely no problems in obtaining and maintaining employment. The possession of viable vocational skills, several in his case, is a strong indicator of a successful adjustment to the community.

4. Mr. Mejia is an excellent employee, who has a strong work ethic. He has worked throughout his lifetime. He currently is working in an institutional job. He is highly motivated to continue his employment in the community.

5. Mr. Mejia has been using his time in a productive manner in the institution. In addition to consistently attending Alcoholics Anonymous over the years, he has functioned as a workshop facilitator in nine Alternatives to Violence workshops. In order to obtain this position, he had to complete the Basic Workshop, as well as the Advanced Workshop, and then also to complete the trainer's training workshop.

6. Current testing shows that Mr. Mejia does not have a substance abuse or substance dependence problem at this point in his life. He openly admitted his use of drugs and alcohol prior to his incarceration and even after he was incarcerated. But after 20 years of sobriety and participation in ongoing treatment programs, this is no longer a problem in his life. Based upon his interview as well as on psychological test results, he will not engage in the use of alcohol or drugs on parole.

7. Mr. Mejia does have a well-developed program for release to the community. He has several letters in the file from a friend, who is offering him assistance with residence placement. He also has a job offer from a former employer. He reported that he had several job offers. His daughter has established a bank account for him upon his release. The fact that he

*15.*

has developed a strong release program is a good indicator that he will do well on parole.

8. According to U. S. Department of Justice, Bureau of Justice Statistics, Probation of Parole Violators in State Prison, 1991 (August, 1995), the propensity to commit crimes declines with age. According to a federal study of state recidivism statistics, older parolees and probationers are re-incarcerated very infrequently. While 51.4 percent of parolees and probationers returned to prison were between the ages of eighteen and twenty-nine, and 36.2 percent were between the ages of thirty and thirty-nine, only 11 percent were between the ages of forty and fifty-four, and 1.4 percent were fifty-five or older. Mr. Mejia is 54 years of age. His risk for criminal behavior or re-offense is very low.

9. A study by the Pennsylvania Prison Society, dated 1993, states that the recidivism rate for paroled life-sentenced inmates is lower than virtually every other category of sentenced inmates. It also reported that experience suggests that no individuals, who have been released on parole after serving a life sentence, have returned for committing a second first-degree murder, and few have returned for other crimes as well. North Dakota reported that in the previous 16 years, no paroled life sentenced inmate had been returned to confinement. New Jersey reported that older offenders had the lowest rate of post-released re-arrest. There were no arrests for new homicides. New York reported, in a 1990 study, that homicide parolees had the lowest return rate for either new convictions or parole violations of any category of paroled inmates. No other category was close.

C. At this point in time, there are no significant risk factors in this case. Alcohol was a significant risk factor at the time of the commitment offense. However, Mr. Mejia has been able to refrain from any involvement with alcohol for the last twenty years, even though it is available to him in the institutional environment. He has conquered this problem in his life.

## XIV. Clinician Observations/Comments/Recommendations:

Mr. Mejia is free from any mental or emotional problems. There is no evidence of any psychopathology that would cause him to be a danger to society when he is released. There is no evidence of any emotional problems that would interfere with routine parole planning. He has excellent vocational skills. He also has a

16.

strong release program in place. At this point in life he has grown and matured. He is an open, honest, responsible individual, who accepts responsibility for his actions in the commitment offense. He does not need to participate in further psychotherapy. His prognosis for successful adjustment in the community is excellent.

In case the writer is not familiar with this evaluator, I have been working with life term inmates now for 40 years. I began as a parole agent in Los Angeles, supervising lifers on parole. As a Parole Agent II in West Lost Angeles, I had a caseload that consisted for the most part of life term inmates on parole. My experience with them is supported by a great deal of research that has been done on these inmates after they are released on parole in the community. In addition, I have been writing BPT evaluations of life term inmates since 1975. I have written evaluations at CCI-Tehachapi, DVI-Tracy, Folsom State Prison, Mule Creek State Prison, CTF-Soledad, and Pleasant Valley State Prison. I have calculated that I have written well over 3000 BPT evaluations. I would readily submit my comments and conclusions to any experienced evaluator for review.

Sincerely,

Melvin Macomber, Ph.D., FACFE, DABFM, DAPPS, FPPR

# *Melvin Macomber, Ph.D.*

**Forensic Psychology**
*CA Lic. # Psy 10145; M16125*

*Diplomate-American Board of Psychological Specialties-Forensic Clinical Psychology*
*Board Certified-American Board of Forensic Medicine;  Board Certified-American Board of Disability Analysts;*
*Diplomate-American Board of Professional Disability Consultants    Fellow--American College of Forensic Examiners*

P.O. Box 3098, Paso Robles, CA 93447-3098  (805) 467-2692

## EDUCATION

| | |
|---|---|
| 1975 | Ph. D., University of Southern California |
| 1968 | M.A., Pepperdine University, Los Angeles |
| 1961 | B.A., Westmont College, Santa Barbara |

## EXPERIENCE

| | |
|---|---|
| 1998-NOW | Contract Psychologist, California Department of Corrections, Caseload Management and Evaluations. |
| 1999-2003 | Consulting Psychologist, Sacramento Assessment Center, Diagnosis and Treatment *Evaluation of adolescents referred by probation.  Academic, social attachment criminality, and psychological problems assessed.* |
| 1998-2003 | Consulting Psychologist, California Department of Mental Health, Mentally Disordered Offender (MDO) Program |
| 1991-2000 | Consulting Psychologist, Board of Prison Terms, MDO Program. |
| 1988-1999 | Valley Mountain Regional Center, Modesto *Psychological evaluations assessing developmental disabilities.* |
| 1988-1989 | Clinical Psychologist, Modesto Psychiatric Center *Intellectual and personality testing of disturbed adolescents.* |
| 1987-1988 | Clinical Psychologist, Crossroads Psychiatric Unit, Memorial Hospital, Ceres *Psychological testing and assessment of children and adults* |
| 1984-1991 | Senior Psychologist, California Department of Corrections *Parole Outpatient Clinic* *Evaluation and treatment of sex offenders and the mentally ill* |
| | *As a prison based psychologist, conducted hundreds of psychological evaluations on inmates in the following prisons:* |
| 1977-1982 | Deul Vocational Institution, Tracy *Senior Psychologist* |
| 1975-1977 | California Correctional Institution, Tehachapi |
| 1973-1975 | California Institution for Men, Chino *Clinical Director, 90 Day Diagnostic and Assessment Unit* |
| 1968-1973 | Assistant Parole Supervisor, Los Angeles |
| 1965-1968 | Parole Agent, Los Angeles |
| 1977-1997 | Professor, (Adj), Psychology, Chapman College |

## LICENSING

Clinical Psychology, State of California (PSY 10145)
Marriage and Family Counselor, State of California (M16125)
Life Community College Credentials:  Psychology, Sociology and Criminal Justice

*18.*

# EXHIBIT 9

S159162

# IN THE SUPREME COURT OF CALIFORNIA

### En Banc

In re JIMMY G. MEJIA on Habeas Corpus

The petition for writ of habeas corpus is denied.

George, C. J., was absent and did not participate.

Werdegar, J., was absent and did not participate.

Corrigan, J., was absent and did not participate.

SUPREME COURT
**FILED**

JUN 1 8 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**CHIN**
_____
*Acting Chief Justice*

August 5, 2008

Jimmy G. Mejia, C-10575
CTF-East Dorm (ED-149L)
P.O. Box 689
Soledad, CA 93960

Petitioner in pro se

Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102

RE: FILING HABEAS CORPUS APPLICATION

Clerk of the Court:

    Please find enclosed the original of my habeas corpus
application. Will you please send me a notice of filing fee due
and I will make arrangements for payment. Thank you.

Respectfully,

Jimmy G. Mejia
Petitioner in pro se

**CV 08    3912**

E-filing    JF

(PR)

Jimmy Mejia, C-10575
CTF-EAST DoRM (ED-149)
P.O. Box 689
Soledad, CA 93960

RECEIVED

AUG 7 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102



$ 04.80°

8/5/08

LEGAL MAIL